[No. B021415. Second Dist., Div. Five. Apr. 25, 1988.]

ROBERT STRICKLAND et al., Plaintiffs and Respondents, v.
FEDERAL INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Cummins & White, James O. White, Robert E. Perkins, Gene A. Weisberg, Horvitz, Levy & Amerian, Ellis J. Horvitz, Barry R. Levy and Peter Abrahams for Defendant and Appellant.

Parkinson, Wolf, Lazar & Leo, Jeffrey H. Leo and G. Arthur Meneses as Amici Curiae on behalf of Defendant and Appellant.

Fadem, Berger & Norton, Bonnie M. Adair and Marlena J. Mouser for Plaintiffs and Respondents.

## OPINION

**BOREN, J.**—In this action for declaratory relief, the trial court awarded respondents the full face amount of their all-risk homeowner's insurance policy for losses they incurred as a result of a continuing geological hazard. We conclude that (1) there was a substantial legal and factual basis for the court's award, and (2) the insurer has no right to contribution either from the soil stabilization efforts of others or from the insurance policies of neighboring landowners. Accordingly, we affirm.

### FACTS

Respondents Robert and Rosalie Strickland have resided in the Big Rock Mesa area of Malibu since late 1982. Appellant Federal Insurance Company (Federal) issued the Stricklands an all-risk insurance policy on their home, which the parties were later dismayed to learn sits atop an ancient landslide. Since the late 1970's, the landslide complex beneath the Strickland residence has undergone continual earth movement as a result of both natural topography and man-made problems such as excavation and septic

system use. Water infiltration plays a large role in causing the hillside's lack of stability. The Strickland property did not suffer structural damage until late 1983, which the experts agree was the point at which they first became aware of the landslide movement, causing significant alarm.

According to the Stricklands' soil and foundation expert, Dr. Singh, the movement of the Big Rock landslide complex has been reduced to an "ever so slow rate" as a result of the dewatering efforts of the County of Los Angeles. Movement has not, however, been arrested. And even if the mesa as a whole slows or stops moving, the various blocks of earth within the slide mass could still move respective to each other. Dr. Singh noted that since 1983, markers set near the Strickland home indicate horizontal movement of about two feet in two years, which translates into an additional seven to eight inches of vertical movement.

Dr. Singh believes it is "highly probable" (at least a 50 percent chance) that the slope will move again within the life of the Strickland structure, although it is theoretically possible that the land could stabilize. He is unable to predict when this movement might occur because today's engineering tools are not sophisticated enough to evaluate all the variables which lead to movement.

One of the primary reasons why the slope is likely to move again in the future is that it lacks stability. Stability is defined and predicted by what is known as a "safety factor" rating. The safety factor scale runs from 1.0 (total slope failure) to 2.0 (100 percent slope safety). "Prudent engineering practice" requires a safety factor rating of at least 1.5.[1] The slide area cross-section beneath the Strickland home has a safety factor rating of 1.06, a near-failure level which Singh characterized as "risky."[2] Because the slope is so close to the failure point, anything could disturb the balance and cause movement. Specifically, dewatering pump failure, a large rainfall or an earthquake could cause movement.

When asked to posit what might happen to the Strickland home when this "highly probable" movement occurred, Singh envisioned several possible scenarios. At worst, there could be "disastrous failure" during which "the whole house could go down with some other homes." A less apocalyptic event would encompass cracking or a large differential (or end-to-end)

[1] Ratings are arrived at by computing the geometry of the slope, the weight and shear strength of the soil, and the water level. Shear strength is restored very slowly to a slope following a landslide; it would take 1,000 years for even a small amount of strength to be restored to the soil.

[2] The two cross-sections of land nearest the one beneath the Strickland home had safety factor ratings of 1.04 and 1.08.

settlement, perhaps breaking gas and water mains. Dr. Singh observed that the Strickland home is particularly vulnerable to movement, noting that it has already suffered differential settlement of two inches, and that four inches of differential settlement typically causes extensive damage to a structure. Normal differential settlement in new residential construction is one-half inch. However, in the case of the Strickland home, the lot was initially graded four to five years before the house was constructed; therefore, 90 to 95 percent of the normal settlement would have occurred before the house was built. Dr. Singh thus believes that the majority of the two-inch differential at the Strickland home was caused by the landslide rather than by normal settlement processes.

Dr. Singh has not advised the Stricklands that their house is unsafe to inhabit, although he suggested that the safety factor is "too close to 1, . . . which is very uncomfortable." He does not believe the stability of the Strickland lot can be improved by sinking caissons into the soil because the slide failure plane causing the instability beneath the house is at too great a depth—180 feet. In his opinion, it would cost more than Federal's $300,000 policy limit to stabilize the Strickland residence. The reason for this is that it would be impossible to stabilize the Strickland home and return it to a reasonable and prudent factor of safety without first spending at least several million dollars, if not far larger sums, to stabilize the entire 155-acre mesa area.

Mrs. Strickland, who with her husband continues to live in the house, testified that she has observed significant interior and exterior cracking, right up to the time of trial. Also, several gas leaks have occurred from the pipes pulling apart, and the house appears to be tilting, so that she is walking downhill inside of her bedroom.

Based on slope indicators that were a few months more recent than those relied upon by Dr. Singh, defendant's expert, Dennis Evans, testified that there is "essentially no discernible movement" in the landslide at present, although the cessation of movement along the slide plane might not halt residual ground cracking and property damage due to stress changes for several years. Evans stated that the dewatering measures undertaken by his firm at the behest of the county had lowered the subsurface groundwater level he assigns as the primary cause of the slide, which has in turn stopped the landslide. He believes that the slide will remain stopped *if* the subsurface dewatering system is properly maintained *and* if an adequate surface drainage system is installed *and* if no earthquake occurs.

In Evans's opinion, the "relative" safety factor rating of the slide mass is between 1.2 and 1.3, assuming no earthquake occurs. That is to say, he

believes the slide is, relatively speaking, 20 to 30 percent safer than it was in 1983, when the safety factor was 1.0 (i.e., total failure). But even with a safety factor of 1.2, the earth could still move due to a phenomenon called "creep" or slow plane strain, according to Evans. He does not know whether creep is occurring at Big Rock as he had not seen evidence of it yet, although one indicator of creep is cracking in rigid structures. Relaxation of the stress in the slide could also cause such cracking.

Absent an adequate surface water drainage system, surface water on the mesa may take minutes, hours, or even months to reach the subsurface dewatering system, and during that travel time, the safety factor rating is lowered. At present, no method is in place to stop the introduction of rainfall and other surface waters which could cause the groundwater level to rise and the slide movement to recur.

Federal's structural failure expert, Mr. Osteraas, testified that the Stricklands' home is structurally intact, though he believes that some of the cracks in the house and around it were caused by earth movement. Both of the defendant's experts conceded that the Strickland lot and home cannot be insulated from further damage unless the stability of the landslide itself is assured. Evans estimated the cost of installing a surface drainage system and stabilizing the bluff and top of the slide at several million dollars.

Federal stipulated at trial that it acknowledges coverage for losses to the Strickland property caused by landslide, up to the policy limits of $272,000 for the dwelling and $27,200 for appurtenant structures.

## TRIAL COURT'S FINDINGS AND JUDGMENT

The trial court found that: 1. Plaintiffs' home is located on the Big Rock Mesa landslide.

2. Movement along the main slide plane has slowed or stopped but surface movement is causing ongoing distress to the house.

3. The residence is habitable, but future damage is probable.

4. Mass landslide movement may be reactivated by water, earthquake, or a variety of local conditions.

5. Repairs to the home are not feasible unless the entire landslide is stabilized.

6. Stabilization costs exceed the defendant's policy limits.

7. The "dwelling" covered by a homeowner's policy includes the land underlying the building.

8. The defendant's policy covers stabilization costs.

9. Uninhabitability is not a prerequisite to the payment of stabilization costs.

10. Plaintiffs are entitled to a policy limits payment because stabilization costs exceed Federal's policy limits.

11. Defendant cannot benefit from the stabilization efforts paid for by others, nor is its liability affected by those efforts.

12. Plaintiffs' home is a "constructive policy limits loss."

Based on these findings, the court's judgment was that defendant owed plaintiffs a policy limits payment of $299,200 (minus an offset for amounts already paid under the policy) plus interest.

Federal appeals.

## DISCUSSION

### 1. *Policy Limits Award for Loss Due to Unstable Soil*

There is no dispute here that damage to the Strickland residence caused by the Big Rock Mesa landslide is a covered peril under Federal's all-risk policy. The issue that remains is this: What is the *extent* of the Stricklands' loss due to the landslide?

The parties rely on three California cases addressing the scope of insurance coverage for loss resulting from landslide. All three of these cases arrive at the same conclusion: When earth movement is an insured peril under a homeowner's insurance policy, the insurer is liable for the full cost of stabilizing the soil underlying the insured dwelling, up to the limits of the policy.

The first case in the landslide trilogy is *Pfeiffer* v. *General Insurance Corporation* (N.D.Cal. 1960) 185 F.Supp. 605, which holds that a policy covering a "dwelling" by necessary implication also covers the soil upon which the dwelling is situated. This much said, the District Court reasoned that since the land underlying the Pfeiffer home was unstable, and the cost of stabilizing the land and restoring the home would exceed the defendant's policy limits, the Pfeiffers were entitled to recover the maximum policy amounts.

The testimony in *Pfeiffer* established that "it would be improvident, unsafe and inconsistent with standard engineering practice to repair the house, without at the same time stabilizing the shifting and unstable land under, above and supporting the dwelling, as an integrated part thereof." (*Id.* at p. 608.) Rejecting the defendant's argument in favor of "replacement costs" (i.e., the relatively minor cost of repairing damage to the dwelling itself), the court concluded that under defendant's interpretation of the policy, the Pfeiffers' rights would be rendered abortive and the policy would result in an absurdity. Asked the court rhetorically, "Must the plaintiff await the result of fire from disturbed gas lines and other myriad difficulties and hazards in rebuilding or repairing the house on a constantly shifting and sliding mass? [¶] . . . . [¶] Defendant would have the plaintiffs await some indefinite future date in measuring their rights under the policy, although conceding that further landslide damage to the buildings is possible." (*Ibid.*)

*Hughes* v. *Potomac Ins. Co.* (1962) 199 Cal.App.2d 239 [18 Cal.Rptr. 650] adopts the *Pfeiffer* rule that a homeowner's policy covering a dwelling also covers the loss which occurs when the soil beneath it slides away. As in the instant case, the actual cosmetic damage to the Hughes dwelling was relatively minor, amounting to only $50. However, the cost of a retaining wall and fill—which were necessary to provide the subjacent and lateral support essential to the stability of the dwelling—was $19,000. Therefore, the court concluded, the plaintiffs were properly awarded the policy limits of $16,000. (*Id.* at p. 253.)

Potomac's interpretation of its policy was essentially that a building was not "damaged" so long as its paint remained intact and its walls still adhered to one another. The court rejected the insurer's interpretation because there was no contractual provision specifically limiting coverage in such a manner. Noting that a dwelling might be rendered completely useless to its owners even in the absence of physical destruction, it observed that "a 'dwelling' or 'dwelling building' connotes a place fit for occupancy, *a safe place in which to dwell or live.*" (*Id.* at pp. 248-249, italics added.)

Federal attempts to distinguish *Hughes* on the grounds that the dwelling in that case was rendered uninhabitable because a portion of it was left overhanging a newly formed 30-foot cliff following the slide. However, the *Hughes* court never stated that the entire house was rendered uninhabitable by the slide; it merely states that no "rational persons" would be "content" to reside in the house after the slide. (*Id.* at p. 249.)

Finally, Division Two of this court, in *Snapp* v. *State Farm Fire & Cas. Co.* (1962) 206 Cal.App.2d 827 [24 Cal.Rptr. 44] (mod. and affd. 60 Cal.2d 816 [36 Cal.Rptr. 612, 388 P.2d 884]), agreed with the *Pfeiffer* court that it would be absurd to have an "all risk" insurer be responsible for nothing

more than minor structural repairs to a dwelling so long as the underlying soil was not fully stabilized. (*Id*. at p. 833.) The trial court had awarded the plaintiffs only $6,684 for damage to the "habitable portions" of the insured dwelling following a landslide caused by improper land fill, despite expert testimony showing that it would be pointless to restore the structure due to the altered condition of the land. (*Id*. at p. 832.) The appellate court, in reversing the amount of the award, observed that "Insofar as [the insurer's] reasoning seeks to divide the 'habitable portions' from their 'foundation portions,' or to consider the structure apart from the land on which it is placed, it fails to impress." (*Ibid*.) It concluded that the hazard insured against had materialized when the underlying soil slid during the policy term, which activated the insurer's duty to restore the premises, and, since the cost of this restoration would exceed the policy limits of $25,000, the plaintiffs were entitled to the face amount of the policy.

In applying the principles enunciated in *Pfeiffer, Hughes* and *Snapp,* we bear in mind that the expert testimony from both parties in this case established that (1) the residence cannot be fully protected from continuing damage unless the entire Big Rock Mesa landslide is stabilized, and (2) the cost of stabilizing the entire landslide area is estimated at several million dollars.

Although the Strickland home has not, up to this point, collapsed or become uninhabitable, there is a significant risk of this occurring because of the instability of the underlying soil. Federal acknowledged at oral argument that there *is* a risk of loss in this case, but disputed the likelihood of its occurrence. Federal mistakenly relies on evidence that the slide has slowed or stopped at present as proof that the risk is insignificant. This posture ignores testimony that the "safety factor" could be as little as 1.06 (or near total failure), because even though the slide may have slowed, movement could easily recur following a breakdown of the existing dewatering system, a large rainfall, or an earthquake. Evans's assertion of a safety factor of 1.2 or 1.3 is substantially undercut by his placement of at least three limiting conditions—none of which are assured—on his estimate. Moreover, even assuming that the safety factor is 1.3, this is still far below the uncontroverted "prudent engineering" safety factor of at least 1.5.[3] Thus, there is no basis for Federal's unsupported assertion that the Strickland home is "safe,"

[3] Federal contends that it does not owe the Stricklands a home that has a safety factor of at least 1.5 because the lot had less than a 1.5 rating at the time they purchased it. However, Federal concedes that the landslide and its attendant low safety factor rating were latent defects for which the Stricklands were insured. The Stricklands could reasonably expect that they were buying a house that met prudent engineering standards and an insurance policy that would guarantee those standards. Federal cannot defeat those expectations by claiming, now that the defect has become patent, that they do not owe the Stricklands a house that meets what Federal describes as "the standard in the industry for safety."

nor did the trial court make such a finding. Finally, and most importantly, all of the experts (including Federal's) agreed that the Strickland home cannot be protected from continuing damage unless the entire landslide is stabilized, and it is apparent from the trial testimony of all three experts that the landslide has *not* been stabilized.

Much like the insurer in *Pfeiffer,* Federal would have its insured absorb the dangers inherent in living atop a land mass which is close to the point of failure, including the hazard of more ruptured gas lines, and possible total collapse during an earthquake or even a rainstorm. This is the type of risk Federal was paid to assume. In light of the authorities which we have cited and the facts we have discussed, we believe that there was substantial evidence from which to conclude that Federal's policy covers the cost of stabilizing the soil underlying the Strickland residence, that it would cost at least several million dollars to stabilize the soil because this requires that the entire landslide be stabilized, and that the continuing cosmetic repairs proposed by Federal are inadequate to compensate for the loss to the Stricklands occasioned by the landslide and continuing instability of the land.

## 2. *Federal's Right to Benefit From the County's Stabilization Efforts and Other Insurance*

Federal contends that it has the right to an offset for the amounts paid by the County of Los Angeles in its effort to stabilize the Big Rock Mesa landslide. The trial court rejected this contention.

In *Hughes* v. *Potomac Ins. Co., supra,* 199 Cal.App.2d 239, the Contra Costa County Flood Control District completely repaired the damage to the Hugheses' dwelling by replacing the soil beneath it, thereby eliminating any possible future loss caused by lack of soil stability. Potomac complained that if the Hughes family recovered under the insurance policy, this would amount to double damages and constitute a windfall to the Hughes. The court of appeal rejected the insurer's "windfall" argument, and adopted the rule followed in New York that an insured is entitled to be compensated for loss in precise accordance with the terms of his contract, and his damages are not to be reduced merely because he has "collateral contracts or relations with third persons which relieve him wholly or partly from the loss against which the insurance company agreed to indemnify him." (*Id.* at p. 251, quoting 1 Joyce on the Law of Insurance (2d ed.) § 24.)

Federal argues that *Hughes* is distinguishable because in that case the county's repairs were gratuitous whereas in this instance the County of Los Angeles is obligated to make the repairs because it is responsible for the Big Rock Mesa landslide. This argument overlooks the *Hughes* court's reliance on two New York cases, *Foley* v. *Manufacturers' & Builders' Fire Ins. Co. of*

*New York* (1897) 152 N.Y. 131 [46 N.E. 318] and *Alexandra Restaurant* v. *New Hampshire Ins. Co.* (1947) 272 App.Div. 346 [71 N.Y.S.2d 515] (affd. 297 N.Y. 858 [79 N.E.2d 268]), both of which held that an insurer is not exonerated from liability for loss even when third parties are already obligated to cure the damages suffered by the insured.

In any event, this case is quite different from *Hughes* in another sense. There, the destabilization damage was completely repaired by Contra Costa County. ■ Here, by contrast, the destabilization damage has not been completely repaired and will cost at least several million dollars *more* than has already been spent, and there is no evidence showing that Los Angeles County plans ever to completely stabilize the slide. Under the circumstances, Federal cannot avoid liability on its policy now in the hopes that the County might one day decide to implement the measures (ranging from a surface dewatering system to buttresses to possibly even the rerouting of the Pacific Coast Highway) which may ultimately be needed to stabilize the landslide. The event insured against has occurred; therefore Federal's obligation to compensate the Stricklands for their loss is operative now, regardless of third parties' potential conduct. Should the Stricklands successfully recover damages from the County or any other defendant for causing the landslide, Federal will at that time be able to exercise its subrogation rights, so no "double recovery" or "windfall" will be obtained by the Stricklands, contrary to Federal's assertions.

■ Federal's final argument is that the Stricklands are only entitled to payment of their pro rata share, as one of 300 homeowners on the Big Rock Mesa landslide, of the cost of stabilizing the slide. In other words, all homeowners on the slide must pool the proceeds of their collective insurance policies, and if the total cost of stabilizing the slide ultimately adds up to an amount that is smaller than the sum of the insurance pool, the insurers can avoid paying out the policy limits on their policies.

Unsurprisingly, Federal offers no precedent for its novel "pooled resources" theory. Under the well-established rules of this state, we analyze insurance contracts to ascertain that meaning of the contract which the insured would reasonably expect. Any limitations which the insurer wishes to place upon coverage must be stated in conspicuous, plain, and clear language. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 270-271 [54 Cal.Rptr. 104, 419 P.2d 168].) We think it is highly unlikely that when the Stricklands purchased their all-risk homeowner's insurance policy from Federal, it occurred to them that recovery on their policy would be contingent upon the creation of an insurance pool with 300 neighbors. We doubt they contemplated the possibility that their policy contained the unarticulated concept that insured losses would be recouped in a manner which was

most cost-effective for their insurer rather than in a manner which was the most expeditious and fair to them. In short, we do not believe that Federal's pooled resources suggestion is consistent with the reasonable expectations of its insured; therefore we decline to read such a requirement into the policy absent a clear and conspicuous provision to the contrary.

### CONCLUSION

The facts in this case show that the soil beneath the plaintiffs' residence is geologically close to the point of total failure, or, at best, far below accepted standards of safety. It is not at all clear that the slide will ever be stabilized, which even Federal's experts concede is a precondition to the protection of the Strickland residence. While it is true that the Stricklands have not yet abandoned their home, it may be fairly surmised that this is because they cannot afford to move elsewhere until they receive the proceeds which Federal has denied them. We believe the Stricklands are denied the benefits of their bargain by being forced to live in a cracking, tilting house atop a shifting, unstable soil mass while their insurer attempts to amortize its liability to them through years of cosmetic repairs that merely mask the symptoms but do not alleviate the cause of the Stricklands' loss. We cannot allow insurers to shift the burden of the loss onto their insureds in this manner, for it unquestionably defeats the purpose for which the insurance was purchased in the first place. The judgment is affirmed.

### DISPOSITION

The judgment is affirmed.

Ashby, Acting, P. J., and Hastings, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 1988.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.