[No. B128620. Second Dist., Div. Four. Nov. 30, 2000.]

JOHN PLUT et al., Plaintiffs and Appellants, v.
FIREMAN'S FUND INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Perona, Langer, Beck & Lallande and Ellen R. Serbin for Plaintiffs and
Appellants

Hager & Dowling, Thomas J. Dowling, Joy L. Lim and John V. Hager for
Defendant and Respondent.

OPINION

CURRY, J.—Appellants John and Karen Plut challenge the trial court's
adjustments to an award of damages after a jury found respondent Fireman's
Fund Insurance Company (Fireman's Fund) liable for breach of insurance
contract and bad faith. We affirm in part and reverse in part.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The Pluts bought a house in Rancho Palos Verdes in 1975. In 1989,
Fireman's Fund issued the Pluts a homeowners policy, effective from June

1989 to July 1990. The policy limits were $522,000 for the dwelling and $261,000 for personal property.

In February 1990, the Pluts hired Roto-Rooter Service & Plumbing Company (Roto-Rooter) to service their drains. In the course of Roto-Rooter's work, it removed a toilet in a first floor bathroom. On March 1, 1990, the Pluts awoke and discovered that the first floor was flooded. They notified Roto-Rooter, which accepted responsibility for the damages. They then reported the loss to Fireman's Fund, indicating that Roto-Rooter had promised to "take care of everything."

The Pluts hired Interior Services, Inc. (ISI) to store and restore their personal belongings, including numerous antiques. In June 1990, the Pluts learned that the truck containing their belongings had been stolen. Shortly thereafter, the police recovered some of the items, but ISI denied the Pluts access to the recovered items until November 1991, thus impairing their ability to inventory their losses.

After mistakenly filing a claim with another insurance company, the Pluts made claims for water loss and theft with Fireman's Fund in late November 1991. In a recorded statement, John Plut told Fireman's Fund on December 6, 1991, that the Pluts intended to sue both Roto-Rooter and ISI. On the same date, the Pluts and Fireman's Fund entered into a nonwaiver agreement, which recites that the parties intended to preserve their rights pending Fireman's Fund's investigation of the claim. Fireman's Fund eventually paid the Pluts a total of $71,378.42.

The Pluts sued Roto-Rooter and ISI in January 1992. Fireman's Fund did not participate in this action or its settlement, although the Pluts apprised Fireman's Fund of developments in the action, and invited it to send a representative to a settlement conference. In September 1995, the Pluts made an additional claim to Fireman's Fund for water loss and theft.

The Pluts reached separate settlements with Roto-Rooter and ISI in November 1996. The Pluts settled their action against Roto-Rooter for $200,000, and against ISI for $400,000. The settlement against ISI expressly recited that the Pluts would not assign any rights of recovery to Fireman's Fund. From the settlement funds of $600,000, the Pluts received $380,000, and the remainder paid their attorney fees and litigation costs incurred in the action against Roto-Rooter and ISI.

On March 10, 1997, Fireman's Fund informed the Pluts that it was denying their claims for theft and damage to personal property because it

believed that the claims were untimely and not discovered within the policy period. On April 22, 1997, the Pluts filed their complaint against Fireman's Fund, alleging causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.

Trial by jury began on September 8, 1998. On October 5, 1998, the jury returned verdicts in favor of the Pluts on their claims for breach of contract and bad faith, and assessed damages in the amount of $536,876.50. The jury made special findings that the Pluts had suffered $486,876.50 in damages as the result of Fireman's Fund's breach of contract, and $50,000 in damages as the result of its bad faith.

Subsequently, Fireman's Fund contended that it was entitled to a reduction of the award of damages in view of the settlement and the $71,378.42 that Fireman's Fund had paid to the Pluts. Following a hearing, the trial court filed a judgment awarding $85,498.08 in damages, not including costs and attorney fees. This appeal followed.[1]

## DISCUSSION

The Pluts contend that the trial court erred in reducing or adjusting the award for damages.

Fireman's Fund's request for a reduction of the damages award is in the nature of a motion for equitable offset, and thus we review the trial court's ruling for abuse of discretion. (See *Margott v. Gem Properties, Inc.* (1973) 34 Cal.App.3d 849, 854 [111 Cal.Rptr. 1].) ▪ With respect to a discretionary ruling, "[w]e are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked. [Citation.]" (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473].)

Here, the trial court did not explain its adjustment. However, Fireman's Fund asked the trial court to set off the settlement proceeds and Fireman's Fund's prior payments against the Pluts' recovery for breach of contract against Fireman's Fund ($486,876.50). Following this request, the trial court reduced the total award by $451,378.42, which is precisely equal to the portion of the settlement proceeds paid to the Pluts ($380,000) and the payments from Fireman's Fund ($71,378.42). Because the trial court evidently offset the award for breach of contract by these settlement funds and

---

[1]Fireman's Fund also filed a notice of appeal from the subsequent award of $162,292.16 in attorney fees to the Pluts. This appeal was subsequently resolved by a settlement, and it was dismissed pursuant to a stipulation on June 28, 2000.

payments, the key issues concern whether the trial court properly adjusted the award for breach of contract in this manner.

## A. Adjustment for Settlement Funds

Before the trial court, Fireman's Fund contended that its rights of subrogation under the policy entitled it to a setoff regarding the $380,000 that the Pluts had received in settlement.[2] We first examine whether these rights support a setoff against the jury's award for breach of contract.

■ "Subrogation is the insurer's right to be put in the position of the insured, in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer. [Citation.]" (*Barnes v. Independent Auto. Dealers of California* (9th Cir. 1995) 64 F.3d 1389, 1392.) "Where a subrogation provision exists, an insurer may recoup its payments directly from the tortfeasor or from the proceeds of the insured's action against a tortfeasor. [Citation.]" (*Pacific Gas & Electric Co. v. Superior Court* (1994) 28 Cal.App.4th 174, 183 [33 Cal.Rptr.2d 522].)

Generally "the insurer's safest course in order to preserve its subrogation rights is to seek intervention in the underlying action" brought by the insured against the legally responsible party. (3 Cal. Insurance Law & Practice (1996 rev.) § 35.11[8][d], pp. 35-52.17 to 35-52.19.) Although there is little California case authority regarding the status of an insurer's subrogation rights when the insurer foregoes participating in the underlying action, the weight of foreign case authority supports the proposition that, in some circumstances, an insurer may recover funds paid to the insured by a legally responsible third party, even though the insurer did not participate in the insured's legal action against the third party. (16 Couch on Insurance (2d. ed 1983) § 61:47, p. 130; 44 Am.Jur.2d (1982) Insurance, § 1820, p. 808.)

A determining factor on this matter is whether the insured has been "made whole." (*Barnes v. Independent Auto. Dealers of California, supra,* 64 F.3d at p. 1396.) "It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for [his or] her injuries, that is, has been made whole. [Citations.]" (*Id.* at p. 1394; see *Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 536 [33 Cal.Rptr.2d 659].)

■ When an insurer does not participate in the insured's action against a tortfeasor, despite knowledge of that action, the insurer cannot recover any

---

[2]The policy provides in pertinent part: "**Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us."

funds obtained through settlement of the action unless the full amount received exceeds the insured's actual loss. (See *Sapiano v. Williamsburg Nat. Ins. Co., supra,* 28 Cal.App.4th at p. 536.) Furthermore, the insured need not account to the nonparticipating insurer "for more than the surplus remaining in his hands, after satisfying his loss in full and his reasonable expenses incurred in the recovery." (16 Couch on Insurance, *supra,* § 61:47, p. 130.) Thus, when an insurer elects not to participate in the insured's action against a tortfeasor, the insurer is entitled to subrogation only after the insured has recouped his loss *and* some or all of his litigation expenses incurred in the action against the tortfeasor. (*Ortiz v. Great Southern Fire & Cas. Ins. Co.* (Tex. 1980) 597 S.W.2d 342, 343-344 [citing cases from several jurisdictions]; *Texas Farmers Ins. Co. v. Seals* (Tex.App. 1997) 948 S.W.2d 532, 533-534; *Motor Club Ins. Ass'n v. Bartunek* (1995) 3 Neb.Ct.App. 292, 293-296 [526 N.W.2d 238, 240-241]; cf. *Lee v. State Farm Mut. Auto. Ins. Co.* (1976) 57 Cal.App.3d 458 [129 Cal.Rptr. 271] [when automobile insurance policy requires insureds to reimburse insurer for medical payments recovered by insured's litigation from third party, insureds are entitled to recoup some or all of their attorney fees incurred in litigation against third party].)

Here, the Pluts received $380,000 from the settlement after they had paid the litigation costs incurred in their action against Roto-Rooter and ISI. In view of this fact and the principles described above, Fireman's Fund is entitled to an adjustment for this $380,000 only if (1) the award of $486,876.50 for breach of contract, taken by itself, is an assessment of the funds necessary to *make* the Pluts *whole* with respect to their property loss, and (2) the judgment against Fireman's Fund supports an equitable setoff.

Regarding item (1), the key issue is whether the jury's finding regarding damages for breach of contract was an assessment of the Pluts' entire property loss. At trial, the Pluts presented expert testimony about the value of the damage to their property as the result of Roto-Rooter's and ISI's misconduct. Fireman's Fund presented conflicting expert testimony on this issue, especially regarding the Pluts' claimed losses concerning their antiques. The jury also heard testimony regarding Fireman's Fund's payments to the Pluts, as well as the settlement of their action against Roto-Rooter and ISI, and the allocation of funds from this settlement.

The jury was instructed that if it determined that the Pluts should recover for breach of contract, it "should award damages to [the Pluts] for the breach of contract *without regard* to any payments received by [the Pluts] for [*sic*] Roto-Rooter, [ISI], and [Fireman's Fund]," and that "the court may *later* deduct the amounts it deems proper from the amount of [the jury's] award

and [the] verdict will be reduced accordingly." (Italics added.) In closing argument, the Pluts' counsel argued that their evidence indicated that the Pluts had suffered $690,285 in loss to personal property, including their antiques, and an additional $203,320 in building losses to their house. Moreover, the Pluts' counsel argued that under the instructions, the jurors were not to consider payments to the Pluts from any source in assessing damages. Counsel for Fireman's Fund argued in closing argument that the Pluts had suffered only $287,261 in losses to their antiques and other personal property. As we have explained, the jury found that the Pluts had suffered $486,876.50 in damages for breach of contract.

We presume that the jury followed the trial court's instructions. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 128 [41 Cal.Rptr.2d 295].) The jury's finding regarding breach of contract damages is well within the policy limits, and the record otherwise indicates that this finding is an assessment of the Pluts' total property losses. Accordingly, we conclude that the award against Fireman's Fund for breach of contract was intended to make the Pluts whole with regard to their property losses.

Regarding item (2), the key issue is whether Fireman's Fund is entitled to a setoff prior to full payment of the jury's award for breach of contract. Generally, "[t]he doctrine of subrogation requires that the person seeking its benefit must have paid a debt due to a third person before he can be substituted to that person's rights and it is not the liability to pay but an *actual payment* to the creditor which raises the equitable right. [Citations.]" (*Arp v. Blake* (1923) 63 Cal.App. 362, 367 [218 P. 773], italics added; accord, *Iusi v. City Title Ins. Co* (1963) 213 Cal.App.2d 582, 587-588 [28 Cal.Rptr. 893].) Nonetheless, the tender of payment, together with assurances of performance, may constitute actual payment for the purposes of subrogation. Thus, in *Bumiller v. Bumiller* (1918) 179 Cal. 119, 124 [175 P. 897], the court concluded that the plaintiff was entitled to subrogation when the plaintiff tendered payment of the underlying obligation before trial and in open court, and deposited the requisite funds in a "proper depository." Furthermore, in suitable circumstances, the party asserting the right of subrogation may seek declaratory relief on this matter without paying the underlying debt. (*Liberty Mut. Ins. Co. v. Harris, Kerr, Forster & Co.* (1970) 10 Cal.App.3d 1100, 1102-1104 [89 Cal.Rptr. 437].)

As our Supreme Court observed in *Harrison v. Adams* (1942) 20 Cal.2d 646, 648-649 [128 P.2d 9], "a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered," and the fact that one of the parties' demands "has not been reduced to judgment is no

obstacle to its allowance as a set-off against a judgment. [Citation.]" In proper circumstances, "a setoff procedure simply eliminates a superfluous exchange of money between the parties." (*Jess v. Herrmann* (1979) 26 Cal.3d 131, 137 [161 Cal.Rptr. 87, 604 P.2d 208].) ▮ In our view, the trial court did not err in concluding that a setoff of $380,000 was appropriate in entering the judgment, given that granting Fireman's Fund's request for a setoff only after it had actually paid the full jury award would have forced a superfluous transfer of the $380,000 to the Pluts and then back to Fireman's Fund. (Cf. *Arp v. Blake, supra,* 63 Cal.App. at pp. 367-368 [in case involving assignment of judgment, judgment debtor's right to set off for payment of judgment preexisted assignment and his actual payment of judgment in view of facts indicating that he would necessarily pay judgment].)

We therefore conclude that the trial court properly set off the surplus funds that the Pluts obtained through the settlement against the award of damages for breach of contract. ▮ The Pluts contend otherwise, arguing that they are entitled to the benefit of the collateral source rule, and citing *Hughes v. Potomac Ins. Co.* (1962) 199 Cal.App.2d 239 [18 Cal.Rptr. 650] (disapproved on another ground in *Sabella v. Wisler* (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889]), *Strickland v. Federal Ins. Co.* (1988) 200 Cal.App.3d 792 [246 Cal.Rptr. 345], and *Kardly v. State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479 [255 Cal.Rptr. 40]. We disagree.

▮ Under the collateral source rule, "[w]here a person suffers personal injury or property damage by reason of the wrongful act of another, an action against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer. [Citations.]" (*Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 349 [170 P.2d 448, 166 A.L.R. 198].) "[I]n the context of the entire American approach to the law of torts and damages," the collateral source rule "performs a number of legitimate and even indispensable functions." (*Helfend v. Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1, 13 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398].) These functions include encouraging the purchasing of insurance to provide for injuries and other eventualities, rewarding thrifty individuals who secure such insurance, and enhancing the recovery of individuals who suffer personal injury. (*Id.* at pp. 9-13.)

▮ However, we have found no case expressly applying this rule in circumstances resembling those before us, and the overwhelming weight of authority in California and other jurisdictions has rejected the extension of the collateral source rule to breach of contract. (*DePalma v. Westland Software House* (1990) 225 Cal.App.3d 1534, 1538 [276 Cal.Rptr. 214];

*United States v. City of Twin Falls, Idaho* (9th Cir. 1986) 806 F.2d 862, 873; *Safeco Ins. Co. v. City of White House, Tenn.* (6th Cir. 1999) 191 F.3d 675, 693; *Garofalo v. Empire Blue Cross and Blue Shield* (S.D.N.Y. 1999) 67 F.Supp.2d 343, 347; *Amalgamated Transit Local 1324 v. Roberts* (1993) 263 Ga. 405 [434 S.E.2d 450, 452]; *Motor Vehicle Admin. v. Seidel* (1992) 326 Md. 237 [604 A.2d 473, 481].) This limitation is traceable to the fundamental differences between recovery in contract and in tort.

In *Erlich v. Menezes* (1999) 21 Cal.4th 543 [87 Cal.Rptr.2d 886, 981 P.2d 978], our Supreme Court recently reaffirmed these fundamental differences, stating: " 'Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectation of the parties are not recoverable. [Citations.] . . .' [Citation.] 'In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered. [Citation.]' [Citation.]" (*Id.* at p. 550, quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515, 516 [28 Cal.Rptr.2d 475, 869 P.2d 454].)

These differences between tort damages and damages for breach of contract support the limitation of the collateral source rule to recovery in tort. Regarding this rule, the Restatement Second of Torts, section 920A, comment b, page 514, states: "[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance . . . , the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. . . . One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." By contrast, as comment e to section 347 the Restatement Second of Contracts observes, the rationale for the collateral source rule is "less compelling" in the case of breach of contract. In such cases, "[t]he injured party is limited to damages based on his actual loss caused by the breach," and the injured party's recovery is reduced if the losses are avoided or mitigated. (Rest.2d Contracts, § 347, com. e, p. 116.)

In our view, the fundamental differences between recovery in tort and in contract, coupled with the weight of case authority, establish that the

collateral source rule is inapplicable here.[3] As we explain below, the cases cited by the Pluts for the contrary position are unpersuasive or factually distinguishable, and thus do not disturb this conclusion.

In *Hughes*, a geological hazard damaged the insureds' home, and they sued their insurer for breach of contract and declaratory relief. (*Hughes v. Potomac Ins. Co., supra*, 199 Cal.App.2d at pp. 249-250.) On appeal, the insurer argued that the insureds had not suffered a loss under the policy because a third party with no liability for the damage had gratuitously repaired the damage. The court in *Hughes* rejected this argument, citing what it termed the "New York rule," as found in *Foley v. Manufacturers' & Builders' Fire Ins. Co. of New York* (1897) 152 N.Y. 131 [46 N.E. 318] and *Alexandra Restaurant v. New Hampshire Ins. Co.* (1947) 272 A.D. 346 [71 N.Y.S.2d 515].

In *Foley*, fire destroyed the insured's buildings while they were under construction, and the New York court held the insured had suffered an insurable loss under the pertinent fire insurance policy even though the contractors were contractually obliged to complete the destroyed buildings. (*Foley v. Manufacturers' & Builders' Fire Ins. Co. of New York, supra*, 152 N.Y. 131 [46 N.E. at p. 319].) In *Alexandra Restaurant*, the insured's landlord repaired the insured's damaged property pursuant to the lease, and the New York court concluded that the insurer could not avoid payment for the damage under the policy, citing *Foley*. (*Alexandra Restaurant v. New Hampshire Ins. Co., supra*, 272 A.D. 346 [71 N.Y.S.2d at pp. 518-522].)

Neither *Hughes* nor the New York authority discussed in *Hughes* refers to the collateral source rule or addresses the issue presented here, namely, whether the collateral source rule precludes an insurer from seeking an offset on the basis of its subrogation rights. In view of the absence of any reasoned discussion of the collateral source rule and its limitations, we do not find *Hughes, Foley*, and *Alexandra Restaurant* persuasive on this issue. Accordingly, to the extent that these cases may support the extension of the collateral source rule to contract, we decline to follow them.

In *Strickland*, the trial court awarded the insureds the full face value of the pertinent policy for losses that they had incurred due to a continuing

---

[3]We recognize that in *City of Salinas v. Souza & McCue Construction Co.* (1967) 66 Cal.2d 217, 226-227 [57 Cal.Rptr. 337, 424 P.2d 921], our Supreme Court suggested in dicta that the collateral source rule might apply to breach of contract claims that sound in tort, but it expressly declined to resolve this matter. However, in *Helfend v. Southern Cal. Rapid Transit Dist., supra*, 2 Cal.3d at page 15, the Supreme Court rejected a key assumption of the *City of Salinas* court's discussion of the collateral source rule, namely, that it is punitive in character. In view of this rejection and the Supreme Court's subsequent emphasis on the differences between tort and contract law, we do not find the dicta in *City of Salinas* persuasive.

geological hazard. (*Strickland v. Federal Ins. Co., supra,* 200 Cal.App.3d at p. 794.) The court in *Strickland* held that an insurer was not entitled to an offset for partial repairs to the insureds' damage by a legally responsible third party because the insureds' losses exceeded both the value of the repairs *and* the limits of the insurance policy at issue. (*Id.* at pp. 801-803.) However, the *Strickland* court noted that if the insureds ever recovered payments for the entirety of their loss, the insurer would be entitled to exercise its subrogation rights. (*Id.* at p. 802.) That is the situation presented here.

Finally, in *Kardly,* the court concluded that the collateral source rule was applicable to emotional distress damages caused by the insurer's tortious conduct, and unrelated to the conduct of the underlying third party tortfeasor. (*Kardly v. State Farm Mut. Auto. Ins. Co., supra,* 207 Cal.App.3d at pp. 485-489.) Here, as we have explained, the setoff is properly viewed as against an award for breach of contract, which is not subject to the collateral source rule.

The Pluts also suggest that Fireman's Fund waived its subrogation rights by failing to participate in the action against Roto-Rooter and ISI, citing primarily *Kardly v. State Farm Mut. Auto. Ins. Co., supra,* 207 Cal.App.3d 479, *Powers v. Calvert Fire Ins. Co.* (1950) 216 S.C. 309 [216 S.C. 309, 57 S.E.2d 638, 16 A.L.R.2d 1261], and *Allstate Ins. Co. v. Mel Rapton, Inc.* (2000) 77 Cal.App.4th 901 [92 Cal.Rptr.2d 151]. Again, we disagree. Because waiver and estoppel rest on factual determinations (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 679 [95 Cal.Rptr.2d 583]), we may reverse the trial court's implied finding on this matter only if the record unequivocally supports the existence of a waiver or an estoppel. Here, the record discloses that the parties entered into a nonwaiver agreement intended to preserve their respective rights under the policy when the Pluts told Fireman's Fund about their impending litigation, and there is no other evidence regarding the equities that unequivocally supports a finding of waiver or estoppel.

*Powers* and *Kardly* are factually distinguishable on this matter. In *Powers,* the court affirmed the implied determination below that a nonparticipating insurer had waived its rights to subrogation, pointing to the insurer's steadfast violation of its statutory and contractual obligations in failing to act on the insured's claim and its denial of all policy benefits. (*Powers v. Calvert Fire Ins. Co., supra,* 216 S.C. 309 [57 S.E.2d at p. 641].) Unlike the insurer in *Powers,* it is undisputed here that Firemans' Fund made some payments under the policy. Moreover, the trial court here impliedly found that there was no waiver or estoppel, and as we have explained, the record discloses sufficient evidence to support this determination.

In *Kardly*, the court concluded, on stipulated facts, that although the nonparticipating insurer had made some payments under the policy, it had waived its subrogation rights, reasoning that the insurer had engaged in fraud and bad faith while encouraging its insured to sue the legally responsible third party, and had asserted its subrogation rights as a shield against further meritorious tort litigation against it. (*Kardly v. State Farm Mut. Auto. Ins. Co., supra,* 207 Cal.App.3d at pp. 488-489.) In reaching this conclusion, the court in *Kardly* stated that the insurer's conduct, as described in the stipulated facts, was similar to the insurer's conduct in *Powers*. However, the facts before us fall outside *Powers*, and nothing in the record suggests that Fireman's Fund asserted its subrogation rights for an improper purpose. Fireman's Fund did not challenge the award of tort damages assessed against it, and its request for an offset was limited to the award for breach of contract.

*Allstate Ins. Co.* is also off point. In *Allstate Ins. Co.,* the insured obtained a judgment in small claims court against the legally responsible third party, and the court held that the insurer, which did not participate in the insured's action, could not initiate its own action against the third party, citing the bar against splitting causes of action. (*Allstate Ins. Co. v. Mel Rapton, Inc., supra,* 77 Cal.App.4th at pp. 907-915.) However, as we have observed, an insurer asserting its subrogation rights may recoup payments directly from the tortfeasor *or* from proceeds obtained by the insured from the tortfeasor. (*Pacific Gas & Electric Co. v. Superior Court, supra,* 28 Cal.App.4th at p. 183.) We discern no California authority for the proposition that, as a matter of law, an insurer's nonparticipation in the insured's action against a legally responsible third party, taken by itself, precludes the insurer from recouping payments from funds obtained by the insured, and the weight of foreign authority supports the contrary view (see *Motor Club Ins. Ass'n v. Bartunek, supra,* 3 Neb.Ct.App. 292 [526 N.W.2d at pp. 241-242], and cases cited therein.) Furthermore, the sole case that we have found that expressly discusses whether the bar against splitting causes of action precludes an nonparticipating insurer from recovering from its insured rejected this contention. (*State Farm Mutual Automobile Ins. Co. v. Elkins* (Tex.App. 1970) 451 S.W.2d 528, 530-531, disapproved on another ground in *Ortiz v. Great Southern Fire & Cas. Ins. Co, supra,* 597 S.W.2d at p. 344.)

In sum, the trial court did not err in reducing the award for damages by $380,000.

B. *Adjustment for Prior Payments Under the Policy*

Before the trial court, Fireman's Fund contended that it was entitled to an offset regarding the $71,378.42 that it had paid the Pluts in response to their claims. As we have observed, the trial court apparently granted this request.

On appeal, Fireman's Fund agrees that it was not entitled to a portion of this reduction because it received $69,177.06 from Roto-Rooter's insurer. Because there is no dispute about this matter on appeal, we do not address the merits of the parties' positions concerning this sum, and conclude simply that the judgment against Fireman's Fund must be increased by this sum. Regarding the remaining net adjustment of $2,201.36, the trial court could properly deduct this sum as a benefit already received under the policy. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 866, pp. 779-780.)

### DISPOSITION

The award of damages against Fireman's Fund is reversed, and the trial court is directed to enter a new judgment awarding the Pluts the sum of $154,675.14 in damages.[4] The judgment is affirmed in all other respects. Appellants are awarded costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.

Appellants' petition for review by the Supreme Court was denied February 14, 2001.

---

[4]This sum represents the net award for breach of contract and bad faith, after the following adjustments:

$486,876.50 (jury award for breach of contract)
−$380,000.00 (settlement funds, after deduction for litigation expenses)
−$ 71,378.42 (payments by Fireman's Fund)

Subtotal: $ 35,498.08
+$ 69,177.06 (funds paid to Fireman's Fund by Roto-Rooter's insurer)

Subtotal: $104,675.14
+$ 50,000.00 (jury award for bad faith)

Net Award: $154,675.14