Filed 1/18/23  McMillin Management Services v. Gemini Ins. Co. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| MCMILLIN MANAGEMENT SERVICES, LP et al., | D079513 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2018-00054403-CU-IC-CTL) |
| GEMINI INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Ryan & Associates and Greg J. Ryan for Plaintiffs and Appellants.

Selman Breitman, Sheryl W. Leichenger, Bridget A. Moorhead, and Rachel E. Hobbs for Defendant and Appellant.

McMillin Management Services, LP and McMillin Homes Construction, Inc. (together McMillin) filed this insurance coverage action against Gemini Insurance Company (Gemini), alleging causes of action for declaratory relief, breach of contract, and breach of the covenant of good faith and fair dealing.  The superior court granted Gemini's motion for summary adjudication as to the cause of action for breach of the covenant of good faith

and fair dealing.  The parties proceeded to a bench trial on the remaining claims.

The superior court found that Gemini breached its duty to defend McMillin.  However, it concluded Gemini was entitled to an equitable offset,[1] based on a settlement payment from another insurance company to McMillin, and reduced McMillin's net recovery to zero.  After trial, the court also denied McMillin's motion to be awarded prejudgment interest.

McMillin appeals, claiming the superior court erred:  (1) in granting summary adjudication; (2) applying an equitable offset; and (3) denying McMillin's request for prejudgment interest.  We conclude that none of McMillin's arguments has merit.  Accordingly, we affirm the judgment.[2]

FACTUAL AND PROCEDURAL BACKGROUND

*The Gemini Insurance Policies and the Construction Defect Litigation*

The facts underlying the dispute are primarily uncontested.  McMillin served as the developer and general contractor for the construction of multiple single-family homes located in Brawley, California (the Project).  McMillin retained several subcontractors to assist in the construction of the Project.  The subcontractors were obligated to hold McMillin harmless from

---

[1]    We will use the word "offset," although we do not differentiate between the words "offset" and "setoff" in the various authorities cited.  (See *Dillingham Construction, N.A., Inc. v. Nadel Partnership, Inc.* (1998) 64 Cal.App.4th 264, 278.)

[2]    Gemini brought a cross-appeal, arguing the superior court erred in finding Gemini had a duty to defend McMillin under the subject insurance policy.  Gemini expressly states it is raising this issue only in the event that this court determines the superior court erred in applying the equitable offset.  Because we affirm the judgment, we do not reach Gemini's argument.

2

any loss or liability arising out of the subcontractors' work and to secure liability insurance naming McMillin as "additionally insured."

During the construction of the Project, McMillin had general liability insurance policies with Evanston Insurance Company (Evanston) (from June 1, 2004 to June 1, 2005), American International Specialty Lines Insurance Company (American International) (from June 1, 2005 to June 1, 2009), and Illinois Union Insurance Company (Illinois Union) (from June 1, 2009 to June 1, 2010). However, Gemini issued four different policies, each lasting a year, to retroactively replace American International's policies. These policies were issued on November 17, 2011, and backdated to replace American International's policies that had been in effect between June 1, 2005 and June 1, 2009. Gemini's policies were not exact replacements of American International's policies. Gemini's insurance policies were general liability policies that provided a duty to defend McMillin after tender of a suit, subject to additional requirements and conditions precedent to coverage.

Gemini's insurance policies provided that Gemini "will pay those sums that the insured becomes legally obligated to pay because of 'bodily injury' or 'property damage' to which this insurance applies." Under those policies, Gemini had "the right and duty to defend the insured against any 'suit' seeking those damages" but had "no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." Further, the policies allowed Gemini, at its "discretion," to "investigate any 'occurrence' and settle any claim or 'suit' that may result."

The Gemini insurance policies also stated that the insurance was "excess over" "[a]ny other primary insurance available to [McMillin] covering liability for damages arising out of the premises or operations, or the

3

products and completed operations, for which you have been added as an additional insured by attachment of an endorsement." The policies further clarified that Gemini had "no duty . . . to defend the insured against any 'suit' if another insurer has a duty to defend the insured against that 'suit.'" However, if no other insurer would defend McMillin, the policies stated that Gemini would undertake McMillin's defense, "but [would] be entitled to the insured's rights against all those other insurers."

The Gemini insurance policies also included a self-insured retention endorsement (SIR), which stated Gemini had no duty to defend unless the retained limit ($250,000) was exhausted. In other words, before coverage under Gemini's insurance policies began, McMillin had to spend $250,000 defending and/or investigating any claim.

In securing insurance coverage from Gemini, McMillin negotiated with Vela Insurance Services, LLC (Vela), the underwriter for Gemini. In its discussions with Vela, McMillin provided a list of all of its construction defect claims, including a lawsuit against McMillin in Imperial County Superior Court entitled, *Cosio et al. v. McMillin Homes, LLC, et al.*, case No. ECU05937 (*Cosio*). That case arose out of the Project and was filed on June 25, 2010. McMillin further represented to Vela that it tendered its defense in construction defect actions to the subcontractors' insurance carriers because it was named as an additional insured under the subcontractors' various policies. As such, McMillin would tender to these additional insurance carriers (AI Carriers) but not to its direct insurers, like Evanston, American International, or Illinois Union. Indeed, in *Cosio*, McMillin filed a cross-complaint, on May 26, 2011, against various subcontractors that performed work on the Project.

4

At the time Gemini issued its policies to McMillin, McMillin used a very sophisticated claims and litigation management for construction defect claims, which was memorialized in a document entitled "McMillin Coverage Litigation Procedures."  That document was provided to Gemini while McMillin was negotiating the Gemini insurance policies with Vela.  The McMillin Coverage Litigation Procedures stated that two of McMillin's goals were to "[p]reserve to the maximum degree, McMillin's ability to enforce its legal rights to defense and indemnity from its subcontractors and AI carriers" and "[r]ecover 100% of McMillin's defense costs[.]"

Before agreeing to provide coverage to McMillin, Gemini required McMillin sign a representation and warranty statement that McMillin would continue its current claims handling practices and procedures as described in the McMillin Coverage Litigation Procedures.  The representation and warranties statements also provided in relevant part:

> "As a material inducement to the issuance of a policy of insurance by Gemini . . . .  McMillin . . . represents and warrants that in connection with the investigation and defense of future construction defect claims it will maintain its current claims handling practices and procedures as have been described to . . . Vela . . . including without limitation the following:
>
> ". . .
>
> "2.  The attorneys listed in Exhibit B attached hereto will be retained by McMillin to defend McMillin and to pursue as appropriate all rights of McMillin, including the tender of coverage on behalf of McMillin to insurers for subcontractors and to timely file and prosecute litigation against such insurers and subcontractors to enforce all rights of McMillin as an additional insured of such insurers and as express indemnitee of such subcontractors . . .
>
>  . . .

5

"[¶] . . . [¶]

"3. . . . McMillin agrees promptly to provide to Gemini upon request a list of all individual claims where management has estimated a reserve in excess of fifty percent (50%) of the $250,000 self-insured retention; . . . "

As relevant to the instant action, McMillin appeared to act consistently with its representations regarding its handling of construction defect litigation. For example, it did not tender the defense of *Cosio* to Gemini during the course of that litigation. Instead, McMillin tendered the defense to its AI Carriers and four of them accepted the tender: American Home Assurance Company, Federal Insurance, The Hartford, and Zurich American Insurance (Zurich). Yet, only Hartford and Zurich eventually paid any defense costs.

In all, McMillin incurred $913,301.31 in fees and costs in *Cosio*. Hartford paid $197,070.02, and Zurich paid $188,673.12 in defense of McMillin in *Cosio*. In addition, under *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541 (*Crawford*), various subcontractors paid McMillin $34,164.50 for defense costs in *Cosio*.

In July 2013, *Cosio* was settled in the amount of $426,400. Regarding the settlement amount paid, $286,000 was funded by subcontractor settlements with McMillin, which totaled $315,164.50. Two other subcontractors agreed to pay $140,400. McMillin did not contribute to the settlement with its own funds. *Cosio* was dismissed on December 5, 2013. On March 25, 2014, McMillin reported to Evanston, one of its direct insurers, that it "ha[d] not yet exhausted the SIR."

After *Cosio* was settled and the complaint dismissed, McMillin had paid $464,763.76 in fees and costs, which had not been reimbursed, to defend the action.

*The AI Coverage Action*

On October 5, 2012, while *Cosio* was pending, McMillin filed an action against AI Carriers based upon McMillin's inclusion as an additional insured on the subject insurance policies. (See *McMillin Management Services, L.P. v. Financial Pacific Ins. Co.* (2017) 17 Cal.App.5th 187, 191 (*McMillin v. Financial Pacific*). The suit named the following defendants: American Home, Arch Specialty Insurance Company (Arch), Financial Pacific Insurance Company (Financial Pacific), First Specialty Insurance Company (First Specialty), Lexington Insurance Company (Lexington); and Probuilders Specialty Insurance Company, RRG (Probuilders). The action was filed specifically to recover defense costs incurred in *Cosio* for the insurers' failure to defend McMillin.

McMillin dismissed First Specialty, American Home, Arch Specialty, and Probuilders without settlement. And McMillin incurred attorney fees in prosecuting the litigation against those AI Carriers.

The two remaining defendants in the litigation, Financial Pacific and Lexington, successfully moved for summary judgment. Judgment was entered in Financial Pacific's favor on December 7, 2015, and judgment was entered in Lexington's favor on January 29, 2016.

McMillin appealed both judgments, and this court affirmed the judgment in favor of Financial Pacific, but reversed the judgment in favor of Lexington. (See *McMillin v. Financial Pacific*, *supra*, 17 Cal.App.5th at p. 210.)

After the case was remanded to the superior court, McMillin and Lexington settled the dispute, on August 29, 2018, with Lexington paying $525,000 to McMillin (Lexington Settlement). The amount paid was not allocated among the causes of action against McMillin or otherwise

7

attributed to *Brandt* fees.[3]  Indeed, the subject settlement agreement stated that each party was to bear its own attorney fees and costs. Further, the Lexington Settlement included a provision explicitly stating that Lexington did not admit any wrongdoing, liability, or coverage under its policy for any of the claims made by McMillin.

*McMillin's Request to Gemini to Pay its Defense Fees and Costs in Cosio*

On September 7, 2016, McMillin reported to Gemini that it was pursuing recovery from the AI Carriers but McMillin had paid defense costs of $460,837.90, exceeding the $250,000 SIR.  After McMillin provided additional material at Gemini's request, coverage counsel for Gemini informed McMillin, on August 16, 2017, that Gemini declined to pay any of McMillin's defense costs, arguing that McMillin had not provided evidence that it had paid, itself, $250,000 in defense costs and fees in *Cosio* as required by the policy's SIR.  However, Gemini stated that its denial letter should not be read as a waiver of any rights under the subject policies or "an exhaustive recitation of policy terms, conditions, exclusions, or endorsements that may potentially apply to Gemini's coverage determination."

---

[3]    In *Brandt v. Superior Court* (1985) 37 Cal.3d 813 (*Brandt*), our high court determined that an insured that is able to prove breach of the implied covenant of good faith and fair dealing may recover as damages its reasonable attorney fees incurred in obtaining the policy benefits wrongfully denied.  (*Id.* at p. 817; see *Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1257-1258.)

*McMillin Sues Gemini*

McMillin brought suit against Gemini and Illinois Union on October 25, 2018.[4]  The complaint included three causes of action against Gemini for:  (1) declaratory relief; (2) breach of contract; and (3) breach of the implied covenant of good faith and fair dealing.  The gravamen of McMillin's suit was its claim that Gemini refused to pay and/or reimburse defense fees and costs incurred by McMillin in *Cosio*.  Gemini answered the complaint, alleging several affirmative defenses including equitable setoff.

On December 22, 2020, Gemini brought a motion for summary judgment, or in the alternative, summary adjudication.  It argued that McMillin's breach of contract was without merit because, among other contentions, McMillin first notified Gemini of its claimed unreimbursed defense fees years after the underlying litigation (*Cosio*) concluded.  Thus, Gemini asserted there was no longer any action to defend under the subject policies and relevant law.  Additionally, Gemini maintained that McMillin had already recovered its defense fees and costs and was not entitled to a double recovery.

Gemini also argued that it did not breach the covenant of good faith and fair dealing under the "genuine dispute" doctrine.  Put differently, Gemini maintained that it did not withhold policy benefits in bad faith, but, at most, did not pay McMillin's defense fees and costs based on mistake or negligence.

---

4    McMillin had an insurance policy with Illinois Union.  The parties settled the lawsuit whereby McMillin dismissed the suit with prejudice as to Illinois Union in exchange for early commutation of Illinois Union's policy and return of the premiums paid in the amount of $988,951.

McMillin filed an opposition to Gemini's motion, to which Gemini filed a reply.

The superior court denied Gemini's motion for summary judgment, finding a triable issue of fact existed as to the breach of contract claim. However, the court granted Gemini's motion for summary adjudication as to McMillin's claim of breach of the covenant of good faith and fair dealing. To this end, the court found there was a " 'genuine dispute' " regarding Gemini's requirement to pay McMillin's defense fees. The court based this finding on the following:

"1. Other than this court's finding there is a triable issue of fact as to tolling, this lawsuit, filed more than 4 years after completion of the dismissal of the *Cosio* case, would be barred by the statute of limitations.

"2. Gemini's policy was excess to the coverage provided by McMillin's additional insured carriers. Moreover, McMillin and Gemini had agreed that **McMillin** would aggressively proceed to obtain defense costs from other available carriers prior to tendering such claim to **Gemini**. McMillin was still pursuing coverage from additional insured carriers up through its *Lexington* settlement on August 29, 2018. Ironically, **McMillin's** tender demand of September 9, 2016, while McMillin was still in hot pursuit of Lexington, arguably may have actually been violative, at least in spirit, of the Representations and Warranties regarding McMillin's Coverage Procedures upon which Gemini had materially relied in issuing insurance to McMillin.

"3. While there remains a triable issue of fact regarding the precise amount of defense costs recovered from the other carriers based upon there being no allocation, it is undisputed that McMillin still received monies totaling 100% of its total defense costs beyond its $250,000 SIR even if one allocates almost one-quarter of a million dollars to *Brandt* fees and other non-defense costs.

10

"4.  Gemini's duty to defend does not include reimbursement for McMillin's costs incurred in prosecution of its cross-complaint against the additional insureds' insurers.  *James 3 Corporation v. Truck Insurance Exchange* (2001) 91 Cal. App.4th 1093, 1104-1105 ("The duty to defend could not extend to requiring the insurer to take affirmative action to recover money . . ."); *Emerald Bay Community Association v. Golden Eagle Insurance Corp.* (2005) 130 Cal.App.4th 1078, 1095 ("Liability insurance policies impose on an insurer the obligation to defend and indemnify an insured, but these policies generally do not impose an obligation to purse claims for affirmative relief against third parties.").  Thus, Gemini should not be responsible for **McMillin['s]** *Brandt* fees incurred chasing after the additional insured carriers.

"5.  As late as March 25, 2014, a date more than 3 months after dismissal of the *Cosio* action, McMillin reported to another direct insurer, Evanston, that it 'has not yet exhausted the SIR.'  Of course, until such exhaustion, there is no duty to defend.  *General Star Indemnity Co. v. Superior Court* (1996) 47 Cal.App.4th 1586, 1593-1594."

The matter then proceeded to a bench trial.  At the trial, the trial court noted that the parties stipulated to many of the facts underlying the breach of contract claim.  For example, the parties stipulated regarding certain aspects of McMillin's construction defect litigation strategy.  To this end, the stipulation set forth, among other things, the following:

"McMillin coordinates the efforts of defense counsel and coverage counsel to implement an approach that will best accomplish the following goals:

"[¶] . . . [¶]

"(3)  Preserve to the maximum degree, McMillin's ability to enforce its legal rights to defense and indemnity from its subcontractors and AI carriers;

11

"(4)  Recover 100% of McMillin's defense costs (both pre-tender and post-tender) incurred in underlying litigation; and

"(5)  Recover 100% of McMillin's *Brandt* fees and costs incurred in pursuing its coverage litigation[.]"

The parties also agreed that McMillin incurred total defense fees and costs of $913,301.13, in *Cosio*, which were offset by McMillin's receipt of $34,164.50 in *Crawford* fees, $28,629.91 in vendor invoice adjustments, and $385,743.14 from two AI Carriers, resulting in McMillin incurring unpaid defense costs of $464,763.76.  However, under the subject policy, McMillin had a $250,000 SIR, so McMillin claimed its breach of contract damages were $214,763.76.  Gemini expressly did not challenge whether the amounts paid by McMillin in defense fees and costs in *Cosio* were reasonable and necessary.

The parties stipulated that McMillin incurred $335,509 in fees and costs to pursue six AI Carriers, including Lexington.  Lexington was the only AI Carrier that settled or otherwise paid any money to McMillin based on McMillin's litigation against those entities.

At trial, Gemini argued that the $525,000 Lexington paid McMillin should be treated like the other AI Carrier's payments made to McMillin during *Cosio*.  Alternatively stated, Lexington's settlement payment should be credited to McMillin's unpaid defense costs, extinguishing any contract damages.  Without any damages, Gemini argued that McMillin could not prove its breach of contract claim.

The trial court found that Gemini had a duty to reimburse McMillin for its defense costs in *Cosio*.  Although the court determined that Gemini's argument that McMillin's tender could be considered premature because McMillin was still pursuing a defense from Lexington at the time McMillin

12

requested payment from Gemini, the court concluded there was nothing in the subject policy "that *absolutely* precluded McMillin from making its tender demand when it did." The court referred to its breach of contract determination as "a close call."

In finding that Gemini breached the subject insurance policy, the court rejected Gemini's assertion that the Lexington Settlement negated any contract damages. To this end, relying on *McMillin Companies, LLC v. American Safety Indemnity Company* (2015) 233 Cal.App.4th 518 (*American Safety*), the court reasoned that Gemini, who denied a defense tender, was not entitled to an offset from settlements with other carriers, that also owed a defense and failed to accept a tender and participate in the defense but eventually settled with McMillin. Thus, the court concluded that McMillin suffered damages in the amount of $214,763.76 (the stipulated amount).

Nevertheless, the trial court found that the Lexington Settlement could be considered as an offset in a posttrial proceeding regarding McMillin's "ultimate recovery" of its damages. And the court noted that "**McMillin and Gemini stipulated that since the evidence received during the trial included the evidence that the court would consider in any such posttrial proceeding to determine equitable offset, the court would decide the issue of equitable offset in this proceeding.**"

The court thus determined that Gemini was entitled to an equitable offset based on the Lexington Settlement. The court explained:

> "Lexington, like Zurich and Hartford, was an AI carrier. The applicable contractual documents between Gemini and McMillin expressly recognize that McMillin was obligated to pursue 100% of defense costs from AI carriers. The Representations and Warranties agreement, signed by McMillin, expressly states that McMillin would continue its current claims handling practices and procedures, 'including the tender of coverage on behalf of McMillin to

13

insurers for subcontractors and to the subcontractors, and to timely file and prosecute litigation against such insurers and subcontractors to enforce all rights of McMillin as an additional insured of such insurers and as express indemnitee of such subcontractors.' (Exh. 9). This representation was 'a material inducement to the issuance of a policy of insurance by Gemini Insurance Company . . . [and] specifically relied upon by Gemini in the determination of the insurability of McMillin.' (Exh. 9). Indeed, McMillin Coverage Litigation Procedures, which McMillin was obligated to follow while insured with Gemini, provides an 'Overall Strategy,' which includes accomplishing the goal of '[r]ecover[ing] 100% of McMillin's defense costs' against AI carriers, an effort that may involve 'vigorously pursu[ing] litigation with its AI carriers through discovery, depositions, motions, and trial. In most instances, disputes over the duty to defend are resolved on an AI carriers' motion for summary judgment. Denial of an AI carriers' motion establishes its duty to defend, leaving it liable for McMillin's defense costs and potentially liable for McMillin's *Brandt* fees and costs in pursuing the action against it.' (Exh. 8). This court has already held that this language protected Gemini from bad faith liability for denying McMillin's defense tender.

"Thus, the agreement between Gemini and McMillin, upon which Gemini expressly relied in issuing its policy of insurance to McMillin and, presumably, in setting the premiums, was that McMillin would vigorously pursue recovery of its defense costs from the AI carriers, thereby creating a direct dollar-for-dollar benefit to Gemini since Gemini's obligation to pay defense costs would effectively be reduced by defense costs paid by these other carriers, an obvious result recognized by McMillin, itself: 'McMillin does not seek a double recovery of its defense costs in its coverage litigation. It is entitled to only one defense.' (Exh. 8.) See *Safeco Insurance Company of America v. Parks* (2009) 170 Cal.App.4th 992, 1004 ("An insured is entitled to only one full defense."). Thus, the concept that Gemini receive an equitable offset from a settlement with an AI carrier McMillin was chasing after, consistent with its

14

agreement with Gemini, does not strike this court as inequitable."

The court then determined how to equitably allocate the $525,000 settlement payment. In doing so, it explicitly found McMillin's argument that applying any of the Lexington Settlement to an offset would not be equitable because McMillin incurred $335,509 in legal fees and costs in pursuing the AI Carriers was "not persuasive."[5] Further, the court made specific findings regarding the Lexington Settlement as follows: (1) McMillin's attorney conceded at trial that none of the $525,000 could be attributable to *Brandt* fees, highlighting the fact that the subject settlement agreement stated that each party was to bear its own costs and fees; (2) a "considerable chunk of the claimed $335,509" McMillin incurred as part of its *Brandt* fees was attributable to its unsuccessful pursuit of Lexington's five codefendants; (3) the Gemini insurance policy did not require Gemini to reimburse McMillin for any of its *Brandt* fees; (4) "very little of the $525,000 Lexington settlement ought to be properly allocated to extinguishing the potential bad faith/punitive damages exposure faced by Lexington" because "[t]here was absolutely no evidence adduced at trial that Lexington had committed bad faith necessary to trigger bad faith/punitive damages or *Brandt* fees"; and (5) the negotiations between McMillin and Lexington "centered upon McMillin's claim for unpaid defense costs in *Cosio* and not Lexington's potential exposure to an award of *Brandt* fees or bad faith/punitive damages." Based on these factual findings, the court,

_____

[5] Because the amount Lexington paid to McMillin per their settlement was unallocated, Lexington represented that it allocated the $525,000 settlement proceeds as follows: $250,000 to reimburse itself for the SIR under its policies with Gemini and the remaining amount to pay a portion of the $335,509 it incurred in pursuing the AI Carriers.

15

"recogniz[ing] that the Lexington settlement . . . extinguish[ed] 'any and all claims' McMillin might have against Lexington," allocated $75,000 of the $525,000 Lexington Settlement to Lexington's potential bad faith/punitive damages and *Brandt* fees while setting the equitable offset at $450,000. As such, the court concluded that this equitable offset "far exceed[ed] McMillin's contractual damages of $214,763.76," and "McMillin's net recovery [was] zero ($0)."

The court then ordered that judgment be entered in favor of Gemini and against McMillin and that Gemini be considered the prevailing party under Code of Civil Procedure section 1032.

Before judgment was entered, McMillin filed a posttrial motion for prejudgment interest, under Civil Code[6] section 3287, subdivision (a), seeking prejudgment interest at a rate of 10 percent on $214,763.76 from the date on which Gemini denied coverage. Gemini opposed the motion on the ground that, among other things, the damages were not liquidated pending a determination that they were actually owed. McMillin filed a reply.

The trial court denied the motion, finding whether the defense fees and costs were "reasonable" (and thus recoverable) was not determined until the time of the parties' stipulation shortly before trial. Accordingly, the amount of the defense costs were not certain or capable of being made certain as of August 16, 2017 under section 3287, subdivision (a).

Subsequently, the court entered judgment on August 25, 2021. Both McMillin and Gemini timely appealed.

---

6    Further statutory references are to the Civil Code unless otherwise specified.

DISCUSSION

I

MOTION FOR SUMMARY ADJUDICATION

A.  McMillin's Contentions

McMillin contends the trial court erred in granting Gemini's motion for summary adjudication as to the cause of action for breach of the covenant of good faith and fair dealing.  We disagree.

B.  Standard of Review and Applicable Law

A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  Summary adjudication works the same way, except it acts on specific causes of action or affirmative defenses, rather than on the entire complaint.  (*Id*., subd. (f).)  Motions for summary adjudication proceed in all procedural respects as a motion for summary judgment.  (*Id*., subd. (f)(2).)  " 'The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish," ' the elements of his or her cause of action." (*Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1026 (*Zubillaga*).)  " ' " ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing.  'The implied promise requires each contracting party to refrain from doing anything to injure the right of the

17

other to receive the agreement's benefits.  To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests.  When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).)

"While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim 'without fully investigating the grounds for its denial.' [Citation.]  To protect its insured's contractual interest in security and peace of mind, 'it is essential that an insurer fully inquire into possible bases that might support the insured's claim' before denying it.  [Citation.]  By the same token, denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable.  'A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim.  The insurer may not just focus on those facts which justify denial of the claim.' " (*Wilson*, *supra*, 42 Cal.4th at pp. 720-721.)

"[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 (*Chateau Chamberay*).)  "This 'genuine dispute' or 'genuine issue' rule was originally invoked in cases involving disputes over policy interpretation, but in recent years courts have applied it to factual disputes as well." (*Wilson*, *supra*, 42 Cal.4th at p. 723.)

"The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. [Citations.] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. 'The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.' " (*Wilson*, *supra*, 42 Cal.4th at pp. 723-724, fn. omitted.)

"Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith." (*Wilson*, *supra*, 42 Cal.4th at p. 724.)

"When determining if a dispute is genuine, we do 'not decide which party is "right" as to the disputed matter, but only that a reasonable and legitimate dispute actually existed.' " (*Zubillaga*, *supra*, 12 Cal.App.5th at p. 1028.) A dispute is legitimate if "it is founded on a basis that is reasonable under all the circumstances." (*Wilson*, *supra*, 42 Cal.4th at p. 724, fn. 7.) " 'This is an *objective* standard.' " (*Zubillaga*, at p. 1028.) "Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of

19

the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 347.)

## C.  Analysis

Here, McMillin points us toward Gemini's letter dated August 16, 2017, wherein Gemini's coverage counsel informs McMillin's coverage counsel that Gemini does not believe it has any obligation to pay defense costs McMillin incurred in *Cosio*.  Gemini's counsel explained that she had reviewed materials provided by McMillin and found "no evidence that McMillin itself paid" the required SIR.  McMillin argues at the time of the August 16 letter, Gemini "had information from its insured[,] which showed McMillin had paid its SIR under its policy."  As such, according to McMillin, there could be no genuine dispute regarding whether Gemini should have reimbursed McMillin for its defense costs incurred in *Cosio*.

In support of its argument that Gemini had proof that McMillin had paid the SIR, McMillin cites to two portions of the record.  First, McMillin relies on paragraph 44 of the trial stipulation, which states:  "On May 12, 2017, McMillin provided supporting documentation requested by Gemini, including accountings, checks, and invoices showing that McMillin itself had paid defense costs in the amount of [$]464,763.76."  However, the stipulation on which McMillin relies was signed by the parties on May 6, 2021.  Therefore, it was not before the trial court when it ruled on Gemini's motion for summary adjudication on March 12, 2021, and we will not consider it on appeal.  (See *Szadolci Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [in reviewing a trial court's ruling on a motion for summary judgment, an appellate court can only consider the evidence presented to the trial court and cannot consider evidence submitted later or for the first time on appeal];

20

*Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 627 ["The trial court's decision must be reviewed on the basis of the papers filed at the time the court considered the motion, not in the light of documents filed subsequent to the trial court's resolution of the issue"].)

Second, McMillin cites to Gemini's response to McMillin's separate statement of undisputed material facts in opposition to the motion for summary judgment.[7] Specifically, McMillin relies on a statement that provides the following:  "McMillin had paid defense costs in excess of the SIR."  This is statement that originated with McMillin as its separate statement of "undisputed facts."

A separate statement is not evidence "of anything," but rather a "mere assertion."  (See *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1022.)  McMillin therefore was required to cite to those pages in the record where the evidence could be found, in addition to the corresponding separate statement of disputed facts.  (See *ibid.*; Cal. Rules of Court, rule 8.204(a)(1)(C) [requiring "any reference to a matter in the record" to be supported by a citation to its location].)

McMillin's failure to do so constitutes a forfeiture of his claim that the court erred in finding there were no triable issues of material fact.  This is because our obligation to conduct a "de novo review [of the grant of summary adjudication] does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues.  As with

---

[7]     When a party files a motion for summary judgment, "[t]he supporting papers shall include a separate statement setting forth plainly and concisely all material facts that the moving party contends are undisputed.  Each of the material facts stated shall be followed by a reference to the supporting evidence."  (Code Civ. Proc., § 437c, subd. (b)(1).)

21

an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. To put it another way, review is limited to issues which have been adequately raised and briefed." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116; see *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [recognizing the principle that an "appellate court is not required to search the record on its own seeking error"]; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1111, 1115 [rejecting appellant's challenge to the grant of summary judgment because, although appellant alleged a " 'plethora of admissible evidence' indicate[d] a triable issue of fact existed" on many of his claims, appellant's failure to "identify this evidence and where it can be found in the record" constituted a waiver of any such error on appeal].)

McMillin commits the same mistake in making the assertion, "There is no dispute that Gemini was aware that McMillin paid the SIR and it deliberately chose to ignore it." It only cites to the separate statement of facts. There is no citation to anywhere in the record where evidence may exist to support this assertion.

Indeed, in reviewing McMillin's discussion of facts in its opening brief, we observe that McMillin simply cited to the same statement of undisputed facts (and not evidence) purportedly establish McMillin provided Gemini with documents proving it had paid in the SIR. However, in a portion of its recitation of the facts, McMillin does cite directly to evidence (Gemini's claim file notes) wherein it argues a Gemini representative "admitted McMillin had provided proof that it actually paid more than the $250,000 SIR." Thus, while McMillin does not cite to additional evidence supporting its assertions

22

here (and we find its reliance on that evidence forfeited), we will consider the claim file notes to evaluate whether they support McMillin's position.

Again, the basic premise of McMillin's argument is as follows. The only reason on which Gemini could base a genuine dispute defense is set forth in the August 16, 2017 letter in which Gemini refuses to contribute to McMillin's defense costs in *Cosio*: Gemini's claim that McMillin had not paid the SIR out of pocket. Gemini could not reasonably dispute McMillin's payment of the SIR because McMillin provided Gemini with information conclusively establishing that it had paid the required SIR. Further, Gemini was fully aware that McMillin had paid the SIR with its own funds at the time Gemini sent the August 16 letter. And McMillin contends certain claim notes establish its theory. Yet, in reviewing that evidence, the claim file notes are not as clear as McMillin represents.

The notes on which McMillin relies, dated October 3, 2017, state the following:

> "4. Gemini's limits are excess over the SIR, which has to be paid by McMillin. McMillin disagrees and says we've breached the contract (SIR endorsement) and cannot take advantage of the SIR provision

> "5. McMillin has provided proof that it actually paid more than $250,00, but there are certain issues relating to information and in any event, McMillin appears to have recovered some of this amount from others

> "One of the main problems here is that McMillin is demanding the entire $460,837.90 (difference from what the costs of defending were less what has been paid by AI insurers) without taking off their own $250,000 retention. The other issue is, as stated above how they're allocating money they've collected for *Crawford* fees as they appear to be saying these are for their costs to pursue, i.e., *Brandt* fees . . . [¶] Taking these factors into account, the total costs of defending the underlying action, to McMillin, was

23

$876,404.90. We have confirmed that Hartford and Zurich issued checks that total $401,148.04. There was also a credit of $66,283.67, which wasn't explained but when added to the total paid toward defense brings the total alleged outstanding unpaid fees to $408,973.19. After applying the $250,000 SIR, this brings the potentially owed fees to $158,973.19

"McMillin[']s case against Lexington was remanded on appeal and continues [¶] There are several issues of accounting that are left unresolved and we've asked McMillin to explain."

In addition, as part of McMillin's argument that Gemini knew McMillin had, itself, paid the SIR, McMillin points to additional claim notes dated March 27, 2018. Those notes state:

"We will see what comes of counsel's further requests to McMillin on unresolved accounting issues and seek to settle based upon the total information. While McMillin still has no outstanding claim against Lexington for AI, the matter is not 'ripe' for settlement anyway."

Although in the October 3, 2017 claim notes, a Gemini representative states that "McMillin has provided proof that it actually paid more than $250,000," the rest of the notes qualify that statement. Indeed, the notes make clear that: (1) "there are certain issues relating to the" documentation that McMillin provided; (2) Gemini believed McMillin had recovered at least some of the amount of the SIR it paid; (3) there was a question about how McMillin allocated the *Crawford* fees it collected it; (4) there existed an unexplained $66,283.678 credit; and (5) "[t]here are several issues of accounting that are left unresolved and we've asked McMillin to explain." As such, these notes do not establish that Gemini knew that McMillin had paid the SIR when Gemini sent its letter on August 17, 2017. To the contrary, the claim notes, written almost two months after the letter, support Gemini's

24

position in the letter that there was some question regarding whether McMillin had paid the SIR out of pocket. Further, the additional claims notes on which McMillin relies, show that "unresolved accounting issues" remained over seven months after Gemini declined to pay any of McMillin's defense costs. And these notes suggest that the parties were continuing to discuss these issues as well.

Thus, the subject claim notes support the trial court's finding that the parties had a genuine dispute about coverage. McMillin believed that it had provided information sufficient to establish it had paid the SIR itself. Gemini questioned some of McMillin's accounting and did not appear sure that McMillin had paid the SIR.

Further, in granting the motion for summary adjudication, the trial court also noted that "[a]s late as March 25, 2014, a date more than 3 months after dismissal of the *Cosio* action, McMillin reported to another direct insurer, Evanston, that it 'has not yet exhausted the SIR.' " The court observed that until the SIR was exhausted, Gemini's obligations under the subject insurance policies was not triggered. The court's finding further undermines McMillin's position that it was undisputed that Gemini knew McMillin had paid the SIR when Gemini declined to pay any defense costs on August 16, 2017. Rather, it begs the questions how and why McMillin incurred additional defense costs for *Cosio* months after it settled. McMillin neglects to answer these questions in its brief. At most, it cavalierly dismisses the court's finding because it was based on "a letter between McMillin and another carrier obtained in discovery in this action."

Against this backdrop, McMillin's failure to cite to specific evidence in the record that supports its position that it was undisputed Gemini knew McMillin had, itself, paid the SIR at the time Gemini declined to contribute

25

to McMillin's defense costs looms all the more large. Again, the only evidence McMillin actually cites in the record suggests there existed a genuine dispute regarding whether McMillin had paid the SIR. At the very least, Gemini appeared to have questions about the documents McMillin provided and the manner in which it accounted its fees and costs as well as payment for those fees and costs McMillin received from AI Carriers and subcontractors. Simply put, without more evidence and discussion of how that evidence supports McMillin's position, we conclude McMillin has not carried its burden here as an appellant and shown the trial court erred. (See *Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379; accord, *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 796.) Moreover, although we review this issue de novo, based on the only evidence McMillin specifically cites in this appeal, we would reach the same conclusion as the trial court.

Although we determine that McMillin has not carried its burden here, we also briefly address McMillin's argument that the trial court could not properly consider any of Gemini's arguments regarding the breach of the covenant of good faith and fair dealing unless Gemini made those same arguments in its August 16, 2017 letter. McMillin bases its argument on the principle that we analyze the reasonableness of the insurer's decision and actions at the time they were made. (See *Chateau Chamberay*, *supra*, 90 Cal.App.4th at p. 347.) This rule is intended to prevent the parties from relying on subsequent events to justify or question the insurer's actions. (*Ibid*; see *Filippo Industries, Inc. v. Sun Ins. Co.* (1999) 74 Cal.App.4th 1429, 1441 (*Filippo*).) The trial court's ruling below does not seem to implicate this rule. Alternatively stated, the trial court did not rely on post-denial discovery of evidence that renders the insurer's decision and actions reasonable.

26

We acknowledge that in its August 16, 2017 letter Gemini focused on the SIR and its claim that McMillin had not paid it. As such, Gemini argued it was not obligated to pay any defense costs for *Cosio*. However, Gemini, in rather boilerplate fashion, did explicitly reserve and not waive any of its rights under the policy with McMillin.

When McMillin first requested Gemini contribute to its *Cosio* defense costs, it explicitly informed Gemini that it was still pursuing AI Carriers. Further, the claim notes on which McMillin relies here also mention that McMillin was continuing to pursue Lexington. In other words, it is undisputed that Gemini knew, at the time it declined McMillin's request for payment, that McMillin had not yet exhausted its efforts against all the AI Carriers. Moreover, the claim notes indicate there was some disagreement between the parties regarding how McMillin should allocate certain payments from AI Carriers. And the claim notes show that, although Gemini calculated what it believed might be its exposure for McMillin's claim, it did not believe settlement was "ripe" because it was waiting to see what happened in McMillin's lawsuit against Lexington. Put differently, the claim notes support the position that Gemini did not believe it owed McMillin any reimbursement while it was still pursuing an AI Carrier. In addition, the evidence before the court at the time of the motion for summary adjudication included McMillin's litigation protocols that stated it aggressively pursued AI Carriers to cover 100 percent of its defense costs, as well as the subject insurance policy that set forth Gemini was in excess to the coverage provided by the AI Carriers. Thus, we do not conclude the trial court erred in finding a genuine dispute based upon the following:

> "Gemini's policy was excess to the coverage provided by McMillin's additional insured carriers. Moreover, McMillin and Gemini had agreed that **McMillin** would aggressively

27

proceed to obtain defense costs from other available carriers prior to tendering such claim to **Gemini**. McMillin was still pursuing coverage from additional insured carriers up through its *Lexington* settlement on August 29, 2018. Ironically, **McMillin's** tender demand of September 9, 2016, while McMillin was still in hot pursuit of Lexington, arguably may have actually been violative, at least in spirit, of the Representations and Warranties regarding McMillin's Coverage Procedures upon which Gemini had materially relied in issuing insurance to McMillin."

In short, based on the record before us, we agree with the trial court that a genuine dispute existed between the parties at the time Gemini declined McMillin's request to contribute to defense costs in *Cosio*, regarding McMillin's payment of the SIR (out of its own pocket) and whether Gemini should contribute to defense costs while McMillin was still pursuing an AI Carrier. The trial court did not err in granting summary judgment as to the cause of action for breach of the implied covenant of good faith and fair dealing.

## II

## EQUITABLE OFFSET

### A. McMillin's Contentions

McMillin contends the trial court erred in applying an equitable offset based on the Lexington Settlement and reducing its net recovery of damages for Gemini's breach of contract to zero. To this end, McMillin advances three primary arguments: (1) As a matter of law, Gemini, as a breaching insurer, was not entitled to an equitable offset until it proved that McMillin received a double recovery (as defined by McMillin); (2) the Gemini insurance policies and related documents required that McMillin be made whole, including being reimbursed for its litigation fees and costs incurred pursuing the AI Carriers, before Gemini could benefit from an equitable offset; and (3) the

28

Lexington Settlement agreement prohibited the trial court from making certain findings in allocating the settlement proceeds. We reject these contentions.

## B. Standard of Review

As a threshold matter, we note the parties disagree on the appropriate standard of review. Citing *American Safety*, *supra*, 233 Cal.App.4th 518, McMillin argues that we should apply de novo review. Gemini asserts that an abuse of discretion standard is applicable to the trial court's determination that an equitable offset was appropriate. (See *Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 103 (*Plut*).) To the extent McMillin is challenging any factual findings of the court, Gemini maintains we should apply a substantial evidence review. Gemini has the better argument.

In *American Safety*, we reversed an order granting motions in limine to preclude certain evidence and argument because in so doing, the trial court essentially granted summary adjudication on an element of the plaintiff's claim and nonsuit on the issue of damages, without requiring the statutory procedural protections associated with summary judgment and nonsuit proceedings. (*American Safety*, *supra*, 233 Cal.App.4th at pp. 541, 543.) However, we did not, as McMillin claims here, establish that the standard of review on a claim for equitable offset was de novo. Rather, because the trial court's "grant of the motion [became] a substitute for a summary adjudication or nonsuit motion," we applied a de novo review to the trial court's legal ruling. (*Id.* at p. 529.)

Here, the procedural posture is much different than that before us in *American Safety*. Unlike the trial court's ruling in *American Safety* that precluded McMillin from presenting evidence or argument that the subject

29

settlement proceeds should not offset contract damages or should be allocated to *Brandt* fees, the trial court in the instant action allowed McMillin to argue and present evidence regarding how it believed the Lexington Settlement should be allocated.  In addition, the court allowed Gemini to argue and present evidence how it believed the Lexington Settlement should be allocated as well.  Ultimately, the court made its findings based on the evidence presented at trial.

In this sense, the court simply addressed the parties' competing claims whether an equitable offset was appropriate under the specific facts of the case.  Such a determination is well within the court's discretion.  (See *Margott v. Gem Properties, Inc.* (1973) 34 Cal.App.3d 849, 854; *Plut, supra,* 85 Cal.App.4th at p. 103.)  Indeed, the parties here stipulated that the court should make such a determination because the evidence that the court would consider "during the trial included the evidence the court would consider in any such posttrial proceeding to determine equitable offset."  As such, we apply an abuse of discretion standard.  Under that standard, we uphold the court's decision if any reasonable judge would have made it, even if we would not have reached the same conclusion.  (See *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 428.)  Further, under an abuse of discretion standard, "the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.)

## C. Analysis

" 'At common law, a setoff is based upon the equitable principle that parties to a transaction involving mutual debts and credits can strike a balance between them.' [Citations.] Setoffs routinely are allowed in actions to enforce a money judgment. [Citation.] The right of offset rests upon the inherent power of the court to do justice to parties appearing before it. [Citations.] . . . [¶] It is the rule that 'if one joint tortfeasor satisfies a judgment against all joint tortfeasors the judgment creditor cannot obtain a *double recovery* by collecting the same judgment from another of the tortfeasors.' [Citation.] The rationale is that '[a]n injured person is entitled to only one satisfaction of judgment for a single harm, and full payment of a judgment by one tortfeasor discharges all others who may be liable for the same injury.' [Citation.] . . . '[W]here fewer than all of the joint tortfeasors satisfy less than the entire judgment, such satisfaction will not relieve the remaining tortfeasors of their obligation under the judgment. Stated otherwise, "*partial satisfaction has the effect of a discharge pro tanto* [for so much]." ' The single satisfaction rule is equitable in nature, and its apparent purpose is to prevent unjust enrichment. [Citation.] The plaintiff is entitled only to a single recovery of full compensatory damages for a single injury." (*Jhaveri v. Teitelbaum* (2009) 176 Cal.App.4th 740, 753-754.)

We are concerned here with insurers, not joint tortfeasors, but the worry of a double recovery is the same. As such, we are mindful that similar rules should apply to the situation before us so that the insured (here, McMillin) does not receive a double recovery. "The fact that several insurance policies may cover the same risk does not increase the insured's right to recover for the loss, or give the insured the right to recover more than once. Rather, the insured's right of recovery is restricted to the actual

31

amount of the loss. Hence, where there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1295.)

Here, McMillin frames the salient issue before us as one of simple math. It notes that when it settled with Lexington on August 29, 2018, it had incurred and paid $464,763.76 (including the $250,000 SIR) in unreimbursed *Cosio* defense fees and costs as well as $335,509 in pursuit of the litigation against the six AI Carriers for a total of $800,272.76. Thus, according to McMillin, the Lexington Settlement left McMillin with a $275,272.76 loss in unreimbursed litigation expenses that would not have been satisfied even if Gemini actually paid the $214,763.76 in contract damages.

Based on these calculations, McMillin claims Gemini could not prove that McMillin would receive a double recovery if Gemini had paid $214,763.76. Moreover, McMillin asserts here that an equitable offset should only be permitted if Gemini proved that McMillin has been made whole. In essence, only after McMillin received payment from AI Carriers covering all its outstanding litigation expenses (whether they were incurred in defending *Cosio* or pursuing other AI Carriers) could Gemini then seek to offset its contract damages to avoid McMillin receiving a double recovery.

Underlying McMillin's position is its rather expansive view of what is required to make it whole, especially in terms of its relationship to Gemini. To illustrate just how sweeping McMillin's definition of whole is, we briefly discuss what damages McMillin is entitled to for Gemini's breach of contract. When a defendant (such as Gemini here) is found liable for breach of

32

contract, the recoverable damages are limited to the amount that will compensate the plaintiff for the detriment caused by the breach because "no one shall profit more from the breach of an obligation than from its full performance." (*Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 511.) The contract limitation on recoverable damages is applicable when the insurer breaches its contractual duty to defend and indemnify an insured. (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1187 (*Ringler Associates Inc.*).) Generally, when a defendant breaches its contract, a plaintiff who suffers no injury because a third party pays for the loss cannot recover damages from the breaching party. However, as we previously held and the trial court noted, when an insurer breaches its duty to defend, it may not use the settlement proceeds paid by other insurers as a liability shield. Rather, those settlement proceeds have the potential to reduce the insured's right to recover damages from the breaching insurer. (*American Safety*, *supra*, 233 Cal.App.4th at pp. 540-541.) Here, the court found Gemini breached its contract with McMillin for its failure to reimburse defense fees and costs that McMillin incurred in *Cosio* and therefore was liable for $214,763.76. As such, that amount is the entire amount of damages to which McMillin is entitled for Gemini's breach.

Despite the Lexington Settlement eclipsing more than double the amount Gemini owes McMillin in damages, McMillin asserts none of the Lexington Settlement proceeds can be applied to offset the damages Gemini owes because McMillin must first be made whole. And to be made whole, according to McMillin, it must be fully reimbursed for all its defense fees and costs in *Cosio*, including the SIR it was contractually required to pay before Gemini's duty to defend is triggered, and all the litigation fees and costs it incurred in pursuing the six AI Carriers. Consistent with this position,

33

McMillin represents that it allocated the Lexington Settlement proceeds as follows: $250,000 to reimburse itself for the SIR in *Cosio* and $275,000 to reimburse it for the fees and costs it incurred in litigating against the six AI Carriers.

We observe two primary issues with McMillin's calculations regarding what would make it whole. First, it assumes that any payment of defense costs by an AI Carrier must first reimburse McMillin for its payment of the SIR. McMillin offers no reason why this must be so. It is undisputed that the Gemini insurance policies required McMillin to pay, out of its own pocket, the SIR before Gemini was obligated to defend or otherwise pay any of McMillin's defense costs in *Cosio*. Indeed, the SIR requirement explains why the parties agreed that, at most, Gemini would be responsible for $214,763.76 if McMillin proved a breach of contract at trial.[8] And McMillin offers no cogent argument, supported by legal authority, that it must be reimbursed for the SIR it was required to pay under subject policy before any of the proceeds of the Lexington Settlement could be applied as an equitable offset.

Second, McMillin assumes that it must be paid all the $335,509 it incurred litigating against the six AI Carriers. However, as the trial court found based on McMillin's legal invoices produced at trial, a "considerable chunk of the claimed $359,509" "was, in fact, spent in the unsuccessful pursuit of Lexington's five co-defendants." McMillin offers no authority that it was required to be reimbursed for the fees and costs incurred in its unsuccessful litigation against the AI Carriers.

---

8     $464,763.76 in *Cosio* defense fees and costs minus the $250,000 SIR equals $214,763.76.

Despite this lack of legal authority, McMillin argues that the subject insurance policies and related documents required it to be made "whole" before the damages Gemini owed for breach of contract could be reduced by the AI Carriers' payments. To this end, McMillin points out that the parties agreed, in the Representations and Warranties, that McMillin would try to be made whole in litigation against AI Carriers. It appears McMillin is actually referring to a document entitled "McMillin Coverage Litigation Procedures," which was exhibit 8 at trial, wherein McMillin represents that it seeks to "[r]ecover 100% of McMillin's defense costs (both pre-tender and post-tender) incurred in underlying litigation[ ] and [¶] [r]ecover 100% of McMillin's *Brandt* fees and costs incurred in pursuing its coverage litigation." In that same document, McMillin also states the following:

> "McMillin does not seek a double recovery of its defense costs in its coverage litigation. It is entitled to only one defense. McMillin's purpose in pursuing its coverage litigation is to be *made whole* for its defense and indemnity costs and for its *Brandt* fees and costs. In the event there is any surplus recovery, McMillin offers its participating AI carriers reimbursement for any overpayments." (Italics added.)

Based on the above language, McMillin argues that it was understood by Gemini that McMillin first pursued AI Carriers to be made "whole," which included payment of all its defense costs as well as its *Brandt* fees and costs. As such, according to McMillin, it was improper for Gemini to argue it was entitled to an equitable offset, and the trial court erred in allocating the proceeds of Lexington Settlement in a manner to apply an equitable offset to reduce its damages to zero. We disagree. We see no such limitation in the language on which McMillin relies. Instead of applying a formula by which settlement proceeds with AI Carriers are to be allocated or clearly indicating that any monies received from AI Carriers must first reimburse McMillin for

35

its litigation costs for pursuing those AI Carriers, the subject language appears to be little more than aspirational. Indeed, the paragraph describing McMillin's purpose to be made whole is part of an explanation of McMillin's litigation procedures and, as the parties agree, was an important piece of McMillin's disclosures in persuading Gemini to provide the subject insurance policies. In this sense, the McMillin Coverage Litigation Procedures are a means to convey McMillin's sophistication and efficiency in dealing with construction defect litigation and ensuring AI Carriers cover McMillin's defense costs. As such, it is not surprising that, within the same document, McMillin described two of the "goals" of its "[o]veral [s]trategy" as recovering 100 percent of its defense costs as well as 100 percent of its *Brandt* fees and costs. We read nothing in this language that would require any settlement McMillin receives from an AI Carrier be first allocated to its *Brandt* fees or otherwise reimburse McMillin for the fees it incurred in unsuccessfully pursuing AI Carriers.

In addition, the language on which McMillin relies undermines its definition of what constitutes making it whole. McMillin's argument rests on the following sentence in its litigation procedures: "McMillin's purpose in pursuing its coverage litigation is to be made whole for its defense and indemnity costs and for its *Brandt* fees and costs." Thus, according to McMillin, to be made whole, all its defense costs and its *Brandt* fees must be paid. However, the $335,509 fees and costs that McMillin incurred in litigation against the six AI Carriers cannot all be categorized as *Brandt* fees. In fact, at most, only the fees and costs incurred litigating against Lexington could be *Brandt* fees as a matter of law.

In *Brandt*, our high court concluded that when an insurer tortiously withholds benefits, attorney fees, reasonably incurred to compel payment of

36

the policy benefits, were recoverable as an element of the damages resulting from such tortious conduct. (*Brandt*, *supra*, 37 Cal.3d at p. 815.) The court observed, "The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself." (*Id*. at p. 817.) The court compared such fees to the recovery of medical fees in a personal injury action. (*Ibid*.) Moreover, the court emphasized it was not dealing with the measure and mode of compensation of attorneys, but with damages wrongfully caused by the insurer's improper action. (*Ibid*.)

The court concluded: "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Brandt*, *supra*, 37 Cal.3d at p. 819.) Furthermore, as these fees are recoverable as damages, the determination of recoverable fees must be made by the trier of fact unless the parties stipulate otherwise. (*Ibid*.)

Because *Brandt* fees are damages as part of a successful suit to compel payment of policy benefits, none of the fees and costs McMillin incurred in its unsuccessful pursuit of five of the six AI Carriers constitute *Brandt* fees. Yet, McMillin ignores this legal distinction and lumps together all the fees and costs it incurred pursuing all six AI Carriers and labels them "*Brandt* fees" for purposes of being made whole. Thus, even if we were to accept McMillin's argument that to be made whole, it must be reimbursed for all its defense fees and costs in *Cosio* as well as its *Brandt* fees, at most, McMillin could be entitled to the *Brandt* fees it incurred against Lexington only. However,

37

there is no indication in the record McMillin delineated between the fees and costs incurred in its litigation with Lexington and those fees and costs it incurred pursuing the other five AI Carriers. Therefore, on the record before us, McMillin cannot establish the amount of *Brandt* fees that would be required to make it whole.[9]

Further, our analysis is not altered when we consider two out of state cases on which McMillin relies: *Weyerhaeuser Co. v. Commercial Union Insurance Company* (2000) 142 Wash.2d 654 (*Weyerhaeuser*) and *Puget Sound Energy v. ALBA Gen. Ins. Co.* (2003) 149 Wash.2d 135 (*Puget Sound*).

*Weyerhaeuser* involved a large hazardous waste cleanup, required under Federal and Washington law, at about 130 sites nationwide. (*Weyerhaeuser*, *supra*, 142 Wash.2d at p. 661.) The plaintiff filed suit for declaratory relief against 34 insurance companies, and after some procedural and appellate maneuvers, all but one of the insurance companies settled with the plaintiff. (*Id.* at p. 662.) The defendant (the only insurance company that

---

9     To the extent McMillin is arguing that the California made-whole rule applies here, we summarily reject that argument. The made-whole rule is a common law principle that limits the insurer's reimbursement right in situations where the insured has not recovered his or her "entire debt." (See *Sapiano v. Williamsburg Nat. Ins. Co.* (1994) 28 Cal.App.4th 533, 536; *Plut*, *supra*, 85 Cal.App.4th at p. 104.) The rule precludes an insurer from recovering any third party funds paid to the insured until the insured has " 'been fully compensated for [his or] her injuries. . . .' " (*Plut*, at p. 104.) Here, McMillin is not seeking to be made whole based on its insured loss or damages. Rather, it is seeking reimbursement for its attorney fees and costs. The "established California rule" is that the made-whole doctrine does not cover attorney fees. (*Sapiano*, at pp. 536-537; see *21st Century Ins. Co. v. Superior Court* (2009) 47 Cal.4th 511, 519 ["[N]o California court has ever held that an insured was not made whole because he or she had to bear the attorney fees incurred in recovering damages not covered by the insurance contract"].)

did not settle) successfully moved for partial summary judgment; then the parties proceeded to trial. (*Id*. at pp. 663, 665.) After trial, the parties appealed and cross-appealed a number of the trial court's rulings. (*Id*. at p. 664.) Relevant here, the defendant challenged the trial court's ruling that it was not entitled to an offset based on the payments made by other insurance companies. (*Id*. at p. 671.)

Following Washington state law, the trial court found that the defendant did not show, by a preponderance of the evidence, that the plaintiff received a double recovery; thus, an offset was improper. (*Weyerhaeuser*, *supra*, 142 Wash.2d at p. 671.) The trial court explained its ruling as follows:

> "Given the facts that we have before us, the form that the releases come in, the multiplicity of the claims and the parties, it is impossible to be able to sort that out at this point and for the court to say affirmatively that [the defendant] has demonstrated that [the plaintiff] has been made whole." (*Id*. at pp. 671-672.)

As such, the trial court made clear that the unique and complicated facts before it thwarted the defendant's efforts to prove an offset was appropriate.

In affirming the trial court on this point, the Washington Supreme Court held that an insurer bears the burden of establishing a double recovery. (*Weyerhaeuser*, *supra*, 142 Wash.2d at p. 674.) The court then concluded that the trial court's finding that that the plaintiff was not made whole was supported by substantial evidence. (*Id*. at p. 675.) In doing so, the court noted the lack of evidence the defendant provided at trial. (*Ibid*.)

Here, we do not agree with McMillin that *Weyerhaeuser* has any applicability to the issue before us. That case was decided under Washington law. There was no discussion of what fees and costs the court considered in calculating whether the plaintiff had been made whole. There is no indication in the opinion that the defendant was required to prove that the

39

plaintiff had been compensated for attorney fees and costs it incurred in pursuing the 33 other insurance companies before the court would find an offset appropriate. Moreover, the facts in front of the trial court in *Weyerhaeuser* appear to be much more complicated than the facts before the trial court in the instant action. Consequently, we conclude *Weyerhaeuser* is not instructive here.

Similarly, we do not find *Puget Sound, supra,* 149 Wash.2d 135 helpful either. There, in another environmental insurance coverage action, the "sole issue before [the] court [was] whether the Court of Appeals holding [was] consistent with *Weyerhaeuser* regarding who has the burden of proof." (*Id.* at p. 140.) In concluding the lower court had erred, Washington's high court reiterated: "[I]f a nonsettling insurer seeks to offset its responsibility for a claim using proceeds from . . . a settlement, it has the burden of establishing what part of the settlement was attributable to the claim it seeks to offset." (*Id.* at p. 141.) However, in reaching this holding, the court merely concluded that summary judgment was not appropriate on the record before it. (*Id.* at p. 142.) We read nothing in *Puget Sound* that offers any support for McMillin's position here.

In short, we find no support for McMillin's position that the proceeds of the Lexington Settlement must have covered *all* its defense fees and costs in *Cosio*, including the SIR, as well as *all* its litigation fees and costs in pursuit of the AI Carriers before the trial court could have allocated it for purposes of an equitable offset. Moreover, we find examples under California law where courts have applied the principle of an equitable offset even where an insurer allegedly breached its duty to defend or indemnify an insured for a loss that also was covered by other insurers with defense or indemnification obligations for the loss.

40

For example, in *Plut, supra,* 85 Cal.App.4th 98, the jury found the insurer liable for breaching a homeowner policy by declining to pay for a loss sustained when a third party's negligence damaged the insured's property. The insurer argued it was entitled to offset payments from the third parties that compensated the insured for the damage. The court held that, because the jury's damage award against the insurer was for the total amount of property damage sustained by the insured, and the collateral source rule was inapplicable to breach of contract recoveries, the insurer was entitled to offset the amounts collected from other responsible parties against the damages awarded for breach of contract. (*Id.* at pp. 107-111.)

Similarly, in *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017 (*Lamb*), two insurers allegedly breached their obligations to defend and indemnify the insured against a third party claim, and the insured therefore defended the claim (incurring approximately $90,000 as defense costs) and settled with the third party at the insured's own expense. The insured sued both insurers, Atlantic and Granite, and one insurer (Granite) settled with the insured for $120,000. (*Id.* at pp. 1024-1027.) In the resulting litigation, the insured argued in part that no portion of the Granite settlement should be available as an offset against the insured's rights against the nonsettling insurer Atlantic because Granite's payment was solely to settle its bad faith exposure. (*Id.* at p. 1042.) The appellate court, after noting that nothing in the record supported the insured's effort to allocate the settlement solely to bad faith, reasoned at pages 1042-1043:

> "In short, we agree with the proposition . . . that [the insured] is simply trying to collect twice for the same claim. If it was [the insured's] intent to allocate the $120,000 paid by Granite . . . , or any portion thereof, to a claim of tortious bad faith on the part of Granite . . . , then [the insured] should have caused such allocation to be explicitly set forth

41

in the Settlement Agreement. . . . [¶] The most that [the insured] is entitled to recover is the balance of the unreimbursed indemnification expense that it incurred. Such recovery, as we explain below, will depend on a determination by the trial court that (1) there is *actual* coverage under the Atlantic . . . policy and (2) [the insured] has proven the actual value of its settlement with [the third party] . . . exceeds the amount paid to [the insured] by Granite . . . over and above the defense cost . . . ."

Thus, the court in *Lamb* employed the approach that, when an insured has collected from one liability insurer, his claim against another liability insurer for the same defense and indemnity costs is reduced pro tanto by the amounts he collected from the settling liability insurer attributable to defense and indemnity costs. Other California courts that have considered analogous issues appear to adhere consistently to this approach. (See, e.g., *Ringler Associates Inc.*, *supra*, 80 Cal.App.4th at p. 1187; *Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 712; *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890, 909.)

Finding no legal impediment to the court exercising its equitable powers to allocate the proceeds of the Lexington Settlement as part of an equitable offset, we move on to McMillin's additional arguments that the allocation was otherwise improper. For example, McMillin asserts that the settlement agreement between it and Lexington prohibited the trial court from making certain factual findings critical to the court's allocation of the settlement proceeds. To this end, McMillin emphasizes that the Lexington Settlement was the resolution of a dispute between McMillin and Lexington and "not an acknowledgment by Lexington that it was obligated to defend or indemnify McMillin." McMillin further points out that California law treats settlement agreements like any other contract for purposes of interpretation (*Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 686), and the

42

intent of the parties controls the meaning of the contract (Civ. Code, §§ 1636, 1638).

McMillin then notes that the agreement made clear that, even though the parties settled the litigation, Lexington's duty to defend and indemnify McMillin was disputed:

"6. <u>Disclaimer of Liability/No Admission</u>

"6.1 McMillin hereby agrees and acknowledges that neither the release by McMillin as set forth in Paragraph 4 above, nor any event occurring during the negotiations of this Agreement, nor any statement or communication made in connection therewith by Lexington and/or its attorneys and/or representatives shall be considered an admission by Lexington of coverage and that the Parties further acknowledge that no past or present wrongdoing on the part of Lexington shall be implied therefrom.

"6.2 This Agreement is made with the understanding that it is not to be construed as an admission of liability by the Parties and that it is made solely for the purpose of compromise of the disputed issues.

"6.3 This Agreement shall be without precedential value and is not intended to nor shall it be construed as an interpretation of any insurance policy and shall not be used as evidence, or in any other manner, in any court or dispute resolution proceeding to create, prove or interpret the obligations of Lexington . . . ."

McMillin therefore argues this language prohibited the court from evaluating and trying Lexington's liability for defense costs and bad faith. However, the trial court did not try Lexington or otherwise find it liable for any damages. Instead, the court simply allocated the proceeds of the Lexington Settlement to calculate the appropriate equitable offset. In other words, nothing in the trial court's findings here modified the Lexington

Settlement agreement or subjected Lexington to any liability. Its liability and/or obligations remained as stated in the settlement agreement.

Further, the court's allocation appears to be consistent with the terms of the settlement agreement, not contrary to it. As the settlement agreement makes clear, the dispute arose when Lexington denied McMillin's tender based on *Casio*. Because of Lexington's denial, McMillin brought suit against it for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. The settlement agreement explicitly stated that McMillin and Lexington were resolving all disputes arising out the tender, *Cosio*, McMillin's suit against Lexington, and any potential contract or tort causes of action based on the adjustment, handling, and/or resolution of the tender. Lexington paid McMillin $525,000 to resolve these disputes. Therefore, it logically follows that the trial court, in determining whether an equitable offset was appropriate, would consider how that payment related to the potential claims McMillin had against Lexington. If the payment Lexington made to McMillin to resolve the coverage litigation did not address Lexington's potential liability and damages for breach of contract and/or breach of the implied covenant of good faith and fair dealing (including *Brandt* fees and punitive damages), what did it resolve? McMillin was able to offer evidence and argument at trial that the settlement proceeds involved other potential claims or damages it had against Lexington, thus limiting its application to defense costs that Gemini otherwise owed it. Yet, there is no indication in the record that McMillin did so, and it does not make that argument on appeal.

Instead, McMillin seems to maintain that because the settlement proceeds were not allocated in the settlement agreement, it could allocate those fees however it pleased without regard to any claim for an equitable

44

offset. That is not the law. If McMillin wanted to specifically allocate portions of the proceeds for certain damages, it should have explicitly done so in the settlement agreement. (See *Lamb*, *supra*, 100 Cal.App.4th at p. 1042.) Indeed, in other settlement agreements, McMillin specifically did so. (See *American Safety*, *supra*, 233 Cal.App.4th at p. 524 [McMillin's settlement affirmatively allocated $274,154 of the total settlement amount of $690,154 to defense expenses incurred in the underlying construction defect case].) Having not done so here, it left open the possibility that Gemini would argue the Lexington Settlement proceeds should be allocated to reduce the amount McMillin was to recover for any breach of contract.

In addition, McMillin takes issue with the trial court's conclusion that the settlement's proceeds were predominately for McMillin's defense costs and not *Brandt* fees or other bad faith damages. McMillin acknowledges the court based its allocation on "four primary factors: (1) the [a]greement provides that the [p]arties [McMillin and Lexington] bear their own attorneys fees and expenses in the coverage action; (2) Gemini was not required to reimburse McMillin for its fees and costs incurred in 'chasing after AI [C]arriers'; (3) the Lexington issue on appeal was a 'close call' demonstrated by the fact that Lexington had prevailed on the issue in the trial court on summary judgment; and (4) settlement negotiations leading up to the agreement centered on unpaid defense costs, not bad faith damages." However, McMillin insists "[n]one of these factors justified an offset allocation of the" Lexington Settlement agreement.

In challenging the first factor, McMillin claims the trial court "stated that, in closing argument, 'McMillin readily conceded that none of the $525,000 could be attributable to *Brandt* fees, noting that the [Agreement] itself, at ¶10.1 expressly provides that "[t]he Parties shall assume and bear

45

their own attorneys' fees, if any, and all their expenses in connection with the Coverage Action." ' " McMillin then stated it "consistently argued throughout the closing argument there should be no allocation" of the Lexington Settlement proceeds and that its "agreement to bear its own fees and expenses in the coverage action does not constitute an allocation of the settlement amounts to *Brandt* fees" or "defense costs." McMillin thus seems to suggest that the trial court was confused or somehow mixed up the argument and evidence. However, McMillin's argument hinges on a misreading of the record.

Contrary to McMillin's representations here, the trial court did not find that McMillin conceded during closing argument that none of the $525,000 could be allocated to *Brandt* fees. Rather, the court noted that, "*at trial*[,] McMillin readily conceded that none of the $525,000 could be attributable to *Brandt* fees," but the court explicitly recognized that "during his closing argument McMillin's attorney backed away from this concession." (Italics added.) The trial court, therefore, considered McMillin's testimony at trial, McMillin's attorney's closing argument, and the actual terms of the settlement agreement in finding little of the Lexington Settlement could be allocated to *Brandt* fees. And McMillin does not address the court's reliance on McMillin's witness's concession that the Lexington Settlement proceeds could not be allocated to *Brandt* fees.

In addition, we are puzzled by McMillin's argument that our holding in *American Safety*, *supra*, 233 Cal.App.4th 518 supports its argument here that the Lexington Settlement agreement prohibited the trial court's allocation of the settlement proceeds. We do not share McMillin's expansive reading of that case.

46

*American Safety*, *supra*, 233 Cal.App.4th 518, concerned insurance coverage litigation brought by McMillin against ASIC, an insurer of a subcontractor that named McMillin as an additional insured. ASIC denied McMillin's tender, which lead to a lawsuit wherein, in the final iteration, McMillin sued ASIC for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. (*Id*. at pp. 522-523.) While the matter was pending, McMillin settled with eight other insurance carriers (who had also been named as defendants in the suit with ASIC). Of the $690,154 in settlement proceeds, the settlement documentation affirmatively allocated $274,154 to defense expenses McMillin incurred in the underlying construction defect suit, with the remaining amount $416,000 unallocated. (*Id*. at p. 524.)

Among other motions in limine filed by the parties, ASIC and McMillin filed dueling motions regarding McMillin's settlement with the other insurers. McMillin moved to exclude evidence or argument about the settlement (or any of its details) while ASIC moved to prevent McMillin from arguing either (a) that the settlement proceeds were not offsets to McMillin's alleged damages for breach of contract or (b) that the settlement proceeds were allocated to McMillin's alleged damages for breach of the implied covenant of good faith and fair dealing. (*American Safety*, *supra*, 233 Cal.App.4th at p. 525.) In support of its motion, ASIC argued that McMillin suffered no contract damages because McMillin had recovered more in its settlement proceeds than its fees and costs in the underlying construction defect litigation. (*Id*. at p. 527.) The trial court ultimately granted ASIC's motion, which precluded McMillin from presenting evidence or argument that the settlement proceeds were not offsets to ASIC's potential contract damages or are allocated to *Brandt* fees. In so doing, the trial court "necessarily

47

allocated at least $309,957 of the previously unallocated Settlement proceeds ($416,000) to McMillin's breach of contract cause of action . . . completely offsetting McMillin's contract damages[.]" (*Id.* at p. 528.) The parties agreed the effect of this ruling was that McMillin could not prove any contract damages, and without contract damages, it could not maintain a cause of action for breach of the implied covenant of good faith and fair dealing. As such, the parties agreed that judgment could be entered in favor of ASIC, with all parties reserving their rights to appeal. (*Ibid.*)

On appeal, we concluded that the trial court erred in granting ASIC's motion in limine because it "essentially grant[ed] a nonsuit in ASIC's favor." (*American Safety*, *supra*, 233 Cal.App.4th at p. 540.) We explained that ASIC's arguments about offsets based on the settlement proceeds did not defeat McMillin's breach of contract claim but only impacted "McMillin's potential *right to recover damages* from ASIC, not whether McMillin *suffered damages* as a result of ASIC's alleged breaches." (*Id.* at pp. 540-541.)

We read nothing in *American Safety* that supports McMillin's position here. The error that occurred in that case (not allowing McMillin to argue and present evidence that the settlement proceeds could not offset its contract damages) is not present in the instant action. Indeed, the trial court followed *American Safety*. It concluded the Lexington Settlement could not negate the element of damages for purposes of determining liability for breach of contract but could offset the amount McMillin recovered for that breach. This is precisely what we deemed proper in *American Safety*. "The fact that the 11 other insurer defendants settled with McMillin should not, and does not, affect whether ASIC breached the duty to defend or the implied covenant of good faith and fair dealing. At best, the Settlement proceeds from the other 11 insurers may reduce (by way of offset) the amount ASIC

48

ultimately owes McMillin for contract or tort damages." (*American Safety*, *supra*, 233 Cal.App.4th at p. 535.)

Nevertheless, McMillin points us to two footnotes in *American Safety* that it claims "are most germane here." First, McMillin emphasizes our statement in *American Safety* that "[o]n remand, McMillin and ASIC may each present whatever evidence it has regarding the intent of the settling parties here." (*American Safety*, *supra*, 233 Cal.App.4th at p. 541, fn. 30.) Based on this portion of footnote 30, McMillin asserts, "It is the intent of the parties to the [Lexington Settlement] [a]greement that is most pertinent to [the] allowance of an offset." McMillin appears to imply that because neither Lexington nor McMillin specifically allocated the settlement proceeds, McMillin, and only McMillin, can allocate those proceeds in the instant action (even if, McMillin allocates a significant portion of the settlement proceeds to fees and costs that do not constitute its defense costs in *Cosio* or *Brandt* fees, as it purports to do here). Essentially, McMillin argues that it may allocate the settlement proceeds to reimburse itself for legal fees and costs to which it is not entitled (here, its fees and costs incurred in its unsuccessful litigation against the five AI Carriers), and the trial court is not permitted to consider any of those proceeds for an equitable setoff. However, there is no California authority imbuing an insured with such unfettered discretion.

In addition, McMillin ignores the context of footnote 30 in *American Safety*, *supra*, 233 Cal.App.4th at page 541. In that footnote, we were rejecting ASIC's argument that, under *Lamb*, *supra*, 100 Cal.App.4th 1017, McMillin could not argue that any portion of the unallocated settlement proceeds be allocated to *Brandt* fees before allocating sufficient settlement proceeds to fully reimburse McMillin for its defense costs in the underlying construction defect litigation. We noted in *Lamb*, in the context of an

49

equitable subrogation dispute between two insurers, that the court stated that a settlement agreement between an insurer and its insured, "which does not even reflect a claim for bad faith was pending or existed," combined with the testimony of a representative from the settling insurer regarding the insurer's intent, was not evidence that the settlement proceeds were intended by the settling parties as "a payment 'for defense and indemnity of bad faith.'" (*Id.* at p. 1042.) (See *American Safety*, at p. 541, fn. 30.) Here, Gemini is not making a similar argument based on *Lamb*. Accordingly, we do not find McMillin's reliance on footnote 30 of *American Safety* helpful to its position. That said, *Lamb*, as well as *American Safety*, both support the approach the trial court took in allocating the Lexington Settlement proceeds based upon the terms of the settlement agreement and the evidence offered by the parties. (See *Lamb*, at p. 1042; *American Safety*, at pp. 535, 541.)

Second, McMillin relies on footnote 26 of *American Safety*, *supra*, 233 Cal.App.4th at page 538, arguing that footnote stands for the proposition that "[a]ffording Gemini a reduction in damages for its liability based on an evaluation of Lexington's separate and independent obligation, violates" the rule that the "fact one insurer may owe a duty to provide a defense will not excuse a second insurer's failure to honor its separate and independent obligation to defend." Again, McMillin misreads our footnote. There, we stated we were not considering ASIC's argument that because other insurers had accepted McMillin's tender those other insurers were required to "'defend immediately and entirely.'" (*American Safety*, *supra*, 233 Cal.App.4th at p. 538, fn. 26.) We noted that ASIC did not present any record references or arguments as to how its contention would apply to the issues before us. (*Ibid.*) As such, far from providing any guidance here, footnote 26 only summarily rejected one of ASIC's implicit arguments.

50

Also, McMillin faults the trial court for justifying its allocation of the Lexington Settlement proceeds based on the court's conclusion that Gemini was not required to reimburse McMillin for its fees and costs pursuing the AI Carriers. McMillin claims that it did not make a demand that Gemini pay its fees and costs for its AI Carrier litigation but merely demanded that Gemini pay for its defense costs in *Cosio*. To this end, McMillin again points out that, even had Gemini paid it $214,763.76 in contract damages, it would not have been made whole for its litigation expenses. This argument is simply a variation of McMillin's previous argument that it must be made whole before Gemini could be entitled to an equitable offset. For the reasons we discussed *ante*, we again reject this contention.

Next, McMillin takes issue with the court basing its allocation of the Lexington Settlement's proceeds on a lack of evidence that Lexington denied coverage in bad faith. Here, McMillin insists "the trial court had no evidence that Lexington lacked bad faith in denying coverage." We disagree. In finding Lexington's potential bad faith exposure was "minimal," the trial court noted that McMillin conceded at trial that the coverage issue was a "close call," Lexington prevailed on the coverage issue at summary judgment, and that other trial courts had similarly interpreted the applicable law "precisely as Lexington had in denying coverage to McMillin." The court further observed that the law was unsettled when we decided *McMillin v. Financial Pacific*, *supra*, 17 Cal.App.5th 187. (See *id*. at pp. 207-210 [discussing the lack of California law governing the issue before the court and analyzing out of state authority].)

Here, McMillin essentially ignores most of the trial court's findings in support of its conclusion that Lexington's potential bad faith exposure was minimal and argues that the court erred as a matter of law in relying on the

51

summary judgment ruling in favor of Lexington "to show a lack of bad faith." We reject this contention, primarily because McMillin does not refute or even address the other findings on which the trial court based its conclusion. In addition, we do not find the case on which McMillin relies, *Filippo*, *supra*, 74 Cal.App.4th 1429, helpful to McMillin's position on this point. That case stands for the proposition that an initial trial court summary judgment ruling for the insurer on the issue of coverage that is subsequently reversed on appeal does not establish, as a matter of law, that the insurer lacked bad faith in denying coverage. (*Id.* at p. 1441.) Nothing analogous occurred here. This is not a situation where an insurer is attempting to spin its one-shot success in convincing a single trial court of its position into proof that its position was reasonable. To the contrary, as discussed *ante*, the trial court based its conclusion that Lexington's potential bad faith exposure was slight on several grounds, not just its summary judgment success.

Finally, McMillin argues the trial court could not base its finding of a lack of Lexington's bad faith on the negotiations between Lexington and McMillin because the subject settlement agreement explicitly states that no "event occurring during the negotiations" of the agreement or "any statement or communication made in connection . . . by Lexington and/or its attorneys and/or representatives shall be considered an admission by Lexington of coverage[.]" In addition, McMillin emphasizes that the settlement agreement contains an integration clause that "supersedes and replaces any and all prior or contemporaneous oral or written communications, agreements, or understandings between [Lexington and McMillin] and their representatives with respect to the matters set forth in it." Neither of these provisions is of the moment here. The trial court did not make any coverage findings as to Lexington or otherwise find Lexington liable for any breach of contract or bad

52

faith. Nor did the court add terms to the Lexington Settlement agreement or ignore its terms. As we discuss in detail *ante*, the court simply analyzed the evidence to determine how Lexington's unallocated settlement payment should be allocated for purposes of an equitable offset. The provisions that McMillin point to here do not impact that determination whatsoever.

McMillin also maintains that it presented evidence to the trial court regarding "the practical reasons that counsel in insurance cases reference calculable defense costs in their negotiations, not some general bad faith damages." This argument goes to the weight of the evidence and is inappropriate for our review here. (See *DeNike v. Matthew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 382.)

In summary, McMillin has not established that it must be made "whole" before the trial court was permitted to allocate the Lexington Settlement proceeds as part of an equitable offset. Indeed, we reject McMillin's definition of what would make it "whole" on the record before us.

Further, nothing in the Gemini insurance policies or the Lexington Settlement agreement prohibited the trial court from allocating the settlement proceeds as it did below. And the court's factual findings in so allocating those proceeds are largely unchallenged by McMillin on appeal and are supported by substantial evidence in any event. Against this backdrop, we conclude the trial court did not abuse its discretion in finding the entirety of McMillin's damages for breach of contract were equitably offset by the proceeds of the Lexington Settlement.

III

PREJUDGMENT INTEREST

A. McMillin's Contentions

McMillin argues that the court erred in denying its motion for prejudgment interest under section 3287, subdivision (a) because the court incorrectly found that damages were not certain until the parties stipulated that they were reasonable and necessary at trial. We disagree.

B. Standard of Review and Applicable Law

Section 3287, subdivision (a), provides, in relevant part, "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." If the requirements of section 3287, subdivision (a), are met, an award of prejudgment interest is mandatory. (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828-829.) "Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of the statute if the defendant actually knows the amount of damages or could calculate that amount from information reasonably available to the defendant. [Citation.] In contrast, damages that must be determined by the trier of fact based on conflicting evidence are not ascertainable." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151.) "The denial of prejudgment interest under section 3287, subdivision (a) presents a question of law we must review on an independent basis." (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347.)

54

## C.  Analysis

Relying on *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, McMillin notes that a dispute over a factual issue may preclude the required certainty under section 3287; a dispute over a legal issue does not.  (See *Continental*, at pp. 1038-1039, 1041.)  Here, McMillin points out that the parties stipulated as to the amount of defense fees and costs McMillin incurred and that such fees and costs were reasonable and necessary.  Consequently, McMillin insists the only issue to be decided at trial was a legal one—whether Gemini breached the subject insurance policy.  In other words, there was no factual dispute as to the amount of damages, only a disagreement as to whether an agreed upon amount was owed (a liability question).  As such, McMillin argues that the amount of damages was certain and prejudgment interest should have been awarded under section 3287, subdivision (a).

In contrast, Gemini argues that it could have challenged whether the defense costs were reasonable and necessary (a factual dispute as to the amount of damages) but chose to stipulate to the amount of damages at trial, "in the interests of efficiency."  To this end, Gemini emphasizes that, in its answer, it raised an affirmative defense that the defense fees and costs were not reasonable and necessary.  Moreover, Gemini maintains that until it elected to stipulate to the reasonableness and necessity of the fees and costs, the "issue remained undetermined, and the amount remained unliquidated."

Here, we need not resolve the dispute between the parties on this prejudgment issue because we see a more foundational problem undermining McMillin's argument that it is entitled to prejudgment interest.  As discussed *ante*, we rejected McMillin's argument that the trial court erred in using a portion of the Lexington Settlement proceeds as an equitable offset for any

55

breach of contract damages.  Thus, we agree with the trial court that McMillin is not entitled to recover any damages.  Subdivision (a) of section 3287 applies when an entity is "entitled to recover damages certain . . ."  However, although the trial court may have found that Gemini breached the subject insurance policy amounting to damages in the amount of $214,763.76, the court ultimately concluded that McMillin was not entitled to recover any damages because "the equitable offset of $450,000 far exceed[ed] McMillin's contractual damages[.]"  Moreover, the conclusion that McMillin was not entitled to recover any damages is buttressed by the judgment wherein the court decreed that "McMillin shall take noting from . . . Gemini by reason of its complaint filed herein."  And the court entered judgment in favor of Gemini and found that Gemini was entitled to its costs as the prevailing party under Code of Civil Procedure section 1032.  As such, there are no damages to which the court stated, via order or judgment, that McMillin is entitled to recover, and section 3287 is not applicable.

## DISPOSITION

The judgment is affirmed.  Gemini is entitled to its costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DATO, J.